Filed 7/26/16  P. v. Moore CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066952 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236506) |
| TARA VIRGINIA MOORE, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 30, 2016, be modified as follows:

1.      On page 70, the second full paragraph, delete the first four sentences beginning "This record clearly shows" through "corroborate the Markoviches' testimony" and replace with the following:

> In assessing whether the prosecution made a good faith effort to secure the presence of the witnesses, the trial court should have considered the prosecution's view that Cdr. Markovich's testimony was important in securing convictions on the counts of financial elder abuse and grand theft from an elder.  Cdr. Markovich was present on the telephone during the conversations between Moore and Dr. Markovich, and his testimony would provide the necessary corroboration without the need to introduce other corroborating evidence of fraud.

2.	On page 76, the first sentence in the first full paragraph beginning "Without citation to authority, Moore asserts" is deleted and the following sentence is inserted in its place:

> Without citation to authority, and without undertaking a harmless error analysis, Moore asserts the confrontation clause error merits reversal.

3.	On page 79, the first sentence in the first full paragraph beginning "The evidence showing the RB Project" is deleted and the following two sentences are inserted in its place:

> The evidence clearly shows that Moore was not a partner on the RB project and had no financial interest in its development.  During the time Moore obtained funds from her mother-in-law for the RB project, the owner, Anderson, had not authorized Moore to act on his behalf in connection with that project.

> There is no change in judgment.

> Appellant's petition for rehearing is denied.

BENKE, Acting P. J.

Copies to:  All parties

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D066952 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236506) |
| TARA VIRGINIA MOORE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.


Steven M. Schneebaum, P.C., Steven M. Schneebaum and Arin Melissa Brenner; The Law Offices of Nicholas J. Moore and Nicholas Moore for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Tara Virginia Moore guilty of grand theft and embezzlement from Berkley and Anderson (Berkley/Anderson counts); grand theft of military survivor benefits from the Department of Defense (military benefits count); financial elder abuse and grand theft from Dr. Dragica Markovich (Dr. Markovich) (Markovich counts); and forgery of a brokerage account statement, all felonies. (Pen. Code, §§ 487, subd. (a), 508, 368, subd. (d), 470, subd. (d).)[1] The jury returned true findings of aggregate loss on the counts involving Anderson, military benefits, and Dr. Markovich (§ 12022.6, subd. (a)(1)-(3)), and sustained the aggravated white collar criminal enhancement (§ 186.11, subd. (a)(2)).[2]

On November 7, 2014, the trial court sentenced Moore to a total term of 15 years eight months, as follows: count 1 (Berkley grand theft), eight months; count 2 (Berkley embezzlement), two years, stayed; count 3 (Anderson grand theft), eight months, plus a sentencing enhancement of eight months under section 12022.6, subd. (a)(2) (aggregate loss); count 4 (Anderson embezzlement), two years, stayed under section 654, plus a two-year enhancement for aggregate loss, also stayed; count 6 (grand theft of federal military benefits), eight months plus a four-month enhancement for aggregate loss; count 7 (Markovich financial elder abuse), four years plus a three-year sentencing enhancement

---

[1] Unless specified, further statutory references are to the Penal Code.

[2] The jury acquitted Moore on a charge of defrauding the Department of Veterans Affairs. The jury was unable to reach a verdict on whether Berkley's aggregate losses exceeded $1.3 million and whether Moore forged a real estate purchase and sale agreement. In the interests of brevity, we do not discuss those charges except where relevant to the issues raised on appeal.

2

for aggregate loss; count 8 (Markovich grand theft), two years, stayed, plus a three-year aggregate loss enhancement, also stayed; and count 10 (forgery), eight months. The trial court ordered all sentences to run consecutively and imposed an additional consecutive five-year term pursuant to the aggravated white collar criminal enhancement. The trial court ordered Moore to pay restitution to her victims, and imposed various fines and fees.

Moore argues the trial court improperly permitted the unrelated offenses to be consolidated for trial, which led the jury to believe she had a criminal disposition. She contends the trial court further erred when it allowed the prosecution to present character evidence, including evidence of uncharged crimes, thereby creating a substantial danger of undue prejudice against her.

With respect to the Berkley/Anderson counts, Moore contends the trial court violated her constitutional right to compulsory process when it denied her request to admit a witness's conditional examination in evidence. She argues the prosecutor committed misconduct by arresting that witness and facilitating his deportation to prevent him from testifying at trial. Moore asserts the trial court erred when it did not exclude documents seized as a result of a defective search warrant. She argues grand theft (§ 487) and embezzlement (§ 508) are not separate offenses.

With respect to the allegation of grand theft of military survivor benefits, Moore contends the state does not have jurisdiction to adjudicate theft of federal military benefits. Alternatively, she argues the federal government is not a "person" under state law, and therefore a charge of grand theft does not apply.

3

As to the Markovich counts, Moore argues the admission into evidence of the videotaped conditional examinations of her former husband, Commander Bogoljub (Bobby) Markovich (Cdr. Markovich), and his mother, Dr. Markovich, deprived her of her Sixth Amendment right to confront the witnesses against her. Moore contends there was not an adequate showing that either witness was unavailable to testify at trial, and she did not have an adequate opportunity to cross-examine Dr. Markovich because her conditional examination occurred prior to any discovery in the case. Moore asserts the prosecution's theory of theft by false pretenses is incorrect as a matter of law, and the appropriate charge should have been larceny by trick. She claims financial elder abuse was incorrectly charged as a separate crime rather than as a sentencing enhancement to the underlying count of grand theft.

Moore contends the forgery count is defective because brokerage account statements are not negotiable or transferable and therefore do not come within the meaning of section 470. Finally, Moore claims the Berkley/Anderson, military benefits and Markovich counts involved different methods of commission and were not interrelated, and therefore did not constitute a pattern of related felony conduct for purposes of imposing the aggravated white collar criminal enhancement penalties under section 186.11, subdivision (a)(2).

We conclude that Moore's convictions for grand theft from Berkley and Anderson (counts 1 & 3) must be reversed. The trial court instructed the jury on three theories of theft, including theft by embezzlement, which has the same elements as embezzlement. The record does not show on which theory of theft the jury convicted Moore. After

4

review, we accept the People's concession that Moore's conviction for grand theft (count 8) from Dr. Markovich must be reversed because grand theft is a lesser included offense of financial elder abuse, and the charges were based on the same conduct. We also conclude that the trial court erred when it determined Cdr. Markovich was unavailable to testify as a witness at trial and admitted into evidence his conditional examination. We nevertheless determine that the constitutional violation was harmless beyond a reasonable doubt. Finally, we conclude that a brokerage account statement is not a document or instrument within the meaning of section 470, and necessarily reverse Moore's conviction for forgery (count 10). In all other respects, the judgment is affirmed.

I.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

*Overview of Charges*

The People alleged Tara Virginia Moore was guilty of grand theft and embezzlement of more than $3 million from her employers, William Berkley and Richard Anderson, resulting in the loss of a commercial property lease in Vista and Berkley's successful restaurant, Jack's La Jolla (Jack's). The People also charged Moore with defrauding the Department of Defense and in a separate count, the Department of Veterans Affairs, of more than $65,000 each by falsely claiming she had not remarried in order to continue receiving military survivor benefits. Moore was charged with grand

---

[3]     Additional factual and procedural background is set forth in the Discussion where relevant to the specific issue raised on appeal.

5

theft and financial elder abuse for obtaining $1.837 million in loans from her then mother-in-law, Dr. Markovich, for a development project that did not exist. The People charged Moore with two counts of forgery for adding her name to Dr. Markovich's brokerage account statement and falsifying a real estate purchase and sale agreement. The People also alleged that Moore engaged in a pattern of fraud and embezzlement involving two or more related felonies resulting in the loss by another person of more than $500,000 under section 186.11, subdivision (a)(2) (aggravated white collar criminal enhancement).

*The Berkley/Anderson Counts*

In 1993, Richard Anderson, an investor, and William Berkley, an entrepreneur who specialized in buying and renovating poorly performing real property, purchased an office and retail complex in San Diego County.[4] Berkley hired Tara Moore to work in the office and show office space to prospective clients. Berkley found Moore to be "quite resourceful." Moore's duties expanded to include bookkeeping and payroll functions, collecting rents, depositing checks, and paying bills.

In 1998, Anderson and Berkley sold their original property at a significant profit. They purchased other properties, creating a separate business entity and bank account for each property. As Anderson and Berkley's holdings increased, Moore's responsibilities expanded. She collected rents, entered data in the financial software application, paid

---

[4] Generally, Anderson owned the properties and Berkley managed them and received a share of the profits when a property was sold. Their precise business arrangements are not relevant here.

expenses, handled incoming and outgoing mail, answered the telephone, and was responsible for providing financial records to certified public accounting firms for tax purposes. Moore's salary ranged from $35,000 to $42,000 a year.

Berkley purchased the Tierrasanta Gateway Center (TGC). He sold TGC in approximately 2002. He was not aware the bank account that was established for TGC revenue and expenses remained open after TGC was sold.

Anderson and Berkley acquired a ground lease in a commercial property in Vista, known as the Burlington Coat Factory (BCF) property. The BCF landlord initiated legal proceedings after not receiving monies due him, and Berkley and Anderson lost the lease. Total rental income from the BCF lease was $559,442. However, Berkley and Anderson learned later that only $53,041 was deposited in the BCF bank account, and there were more expenses attributed to BCF than were justified.

Anderson purchased an undeveloped 10-acre property in Rancho Bernardo (RB project or RB property) in 1997, and set up a partnership with Berkley to develop it. Anderson invested approximately $3 million to acquire the property, grade the site and prepare it for development. In 2001, Berkley relinquished his interest in the RB Project to Anderson.

In approximately 2005, Moore told Berkley that Anderson was going to sell the RB property to her at an attractive price and offered Berkley a 25 percent interest if he would invest in the project. During the next three years, Moore talked to Berkley about investing in the RB Project. She said she had sufficient financial resources for the deal. Moore told Berkley she had hired an architect to do a preliminary study, identified a

7

prospective tenant, and obtained a soils report. At trial, Anderson testified he still owned the RB property. He never discussed selling it to Moore. After Berkley relinquished his interest in 2001, Anderson retained sole ownership of the RB property and did not have any other partners.

In 2002, after selling his other properties, Berkley purchased a property at the corner of Girard Avenue and Wall Street in La Jolla. He leased a portion of the property to tenants, including his own real estate management company. His rental income paid for 90 percent of his operating expenses. Berkley personally invested $7 million or $8 million to develop the other portion of the property. His restaurant, Jack's La Jolla, opened in 2005. Berkley opened a second restaurant and a nightclub at the same site in 2006.

Jack's was an immediate success. Nevertheless, near the end of 2006, Jack's started having cash-flow problems. Checks to employees and vendors were returned for insufficient funds. Moore was doing all the accounting for Berkley's businesses with advice from Consadine & Consadine, a certified public accounting firm. Moore hired her brothers to help her with Berkley's accounting. She named her operation The Brevard Group.

In 2007, Consadine & Consadine told Berkley the company's bank deposits were off by a large amount and could not be reconciled. Jan Jenkins, a consultant hired to resolve accounting problems, had problems getting the financial information she needed from Moore. As a result, only some of the recommended accounting functions were implemented. In March 2008, Moore changed Berkley's accounts to another bank just as

8

Berkley was getting online access to his accounts. She switched banks again in December 2008.

In April 2009, the California Board of Equalization (the BOE) contacted Berkley and told him Jack's owed more than $500,000 in unpaid sales taxes. Berkley learned Moore had an unauthorized power of attorney giving her authority to work with the BOE. Moore had concealed from Berkley the BOE notices of unpaid tax liability.

Berkley also learned Moore had written a $100,000 check out of his business account to pay for her wedding and personal expenses. He discovered the TGC bank account was still open and the account statements were sent to Moore's post office box. At trial, Berkley testified that more than $1.28 million in rent checks from his other companies was deposited in the TGC bank account after TGC was sold.

Moore claimed she had loaned money to Jack's from her personal accounts. She approached Berkley about buying Jack's, claiming Berkley owed her $2 million. To show she had the resources to purchase the property, Moore presented a Morgan Stanley account statement listing her, Dr. Markovich and Cdr. Markovich as owners of a brokerage account valued at $1.957 million. Berkley verified there were no accounts with Moore's Social Security number held at Morgan Stanley.

Berkley asked his accounting firm, Consadine & Consadine, to conduct a review of his company's financials. After review, Consadine & Consadine informed Berkley that Moore was involved in a classic embezzlement scheme. Berkley banned Moore from the premises. He hired a new manager with more than 30 years of experience in the restaurant business. The new manager took over the accounting for Jack's. There were

no more checks returned for insufficient funds. The restaurant was doing well. However, in late July 2009, the BOE suddenly confiscated all the money in Berkeley's bank account.

Berkley was exhausted. On July 30, 2009, he abruptly closed Jack's. Jack's 120 employees lost their jobs. Berkley's net worth went from $15 million to owing more than $1 million. Berkley hired a forensic accountant and filed for bankruptcy. In an office at Jack's, the forensic accountant found three of Moore's personal bank statements showing Moore made unusually large deposits in March, April and May 2008. The accountant suggested Berkley contact the district attorney.

Forensic review of the bank accounts of Moore and the Anderson/Berkley business entities showed that starting in approximately 2003, Moore began diverting rent checks payable to the Anderson/Berkley businesses to her personal use. Moore deposited the rent checks directly into her own bank account or into the TGC account and then to her bank account. She also began to write checks to herself from the Anderson/Berkley businesses. Moore concealed these transactions, in part, by recording them as payments to legitimate vendors, and providing falsified registers to the accounting firms for tax purposes. On occasion, Moore would make a deposit into Berkley's account from her own bank account. She recorded some of those funds as personal loans from her to Berkley.

A forensic accountant examined the Brevard Group's records and determined its primary function was to fabricate accounting records. The Brevard Group did not file taxes, send invoices for its work, or record payroll. The forensic accountant concluded

10

that of monies belonging to Anderson, Moore deposited $499,572 directly into her bank account, and $1,270,942 into the TGC account and from there into her bank account. Moore returned $429,298 to Anderson as a "loan." She redirected $3,140,534 in Berkley's funds to her bank account, returning $942,901 to him as a "loan."

*The Military Benefits Count*

The Survivor Benefit Plan was enacted by Congress in 1972 to provide benefits to surviving spouses and dependent children of deceased military retirees. (Pub.L. No. 92-425, 86 Stat. 706, enacted Sept. 21, 1972, 10 U.S.C. §§ 1447-1455.) It is administered by the Defense Finance and Accounting Services (DFAS), a service agency to the Department of Defense. If a surviving spouse under the age of 55 years remarries, he or she is no longer entitled to receive benefits. The surviving spouse is required to sign a Certificate of Eligibility (COE) each year attesting that he or she "did not marry in the past year."

Moore married Robert Moore, a United States Navy pilot, in 2003. He died from cancer in May 2005 while on active duty. Moore filed an application for DFAS military survivor benefits on June 8, 2005.

In October 2005, Moore married Cdr. Markovich, a pilot in the United States Navy and Robert Moore's best friend. Moore asked Cdr. Markovich to keep the marriage a secret out of respect for her late husband. They never lived together. Moore and Cdr. Markovich divorced in February 2009. Two weeks later she married David Fox.

After her marriage to Cdr. Markovich, Moore signed COE forms in October 2006, May 2007, July 2007, and March 2008 stating she had not married in the past year. After

11

she married Fox, Moore signed COE forms in July 2010 and May 2011 stating she had not married in the past year. She received a total of $74,829 from DFAS. In 2011, Moore's account was suspended and the matter was referred to Naval Criminal Investigative Services.

*The Markovich Counts*

Cdr. Markovich believed Moore, Berkley and Anderson were business partners and Moore was working on the RB Project. Cdr. Markovich helped Moore with what she said were expenses for the RB Project. When he had exhausted his savings, credit and home equity, Cdr. Markovich suggested they ask his mother for a loan.

In October 2006, Cdr. Markovich telephoned his mother and Moore explained the RB Project to her. Moore told Dr. Markovich the permits for the project were about to expire and she need $135,000 to protect her investment. Moore said she expected to make $24 million to $30 million on the RB Project. Dr. Markovich agreed to lend $135,000 to Moore. Moore made repeated requests for money, each time telling Dr. Markovich she needed a specific amount of money for a specific purpose for the RB Project. In total, Moore received approximately $1.837 million from Dr. Markovich.

Dr. Markovich began to worry about depleting her life savings to help her son and daughter-in-law. In October 2007, Moore and Cdr. Markovich signed a promissory note agreeing to pay Dr. Markovich the amount of $1,551,472.17, plus an unspecified amount of interest. Moore began paying $4,000 a month to Dr. Markovich. In approximately May 2008, Moore and Cdr. Markovich signed a second promissory note, agreeing to pay $700,000 to Dr. Markovich by August 31, 2008. Moore showed Dr. Markovich a real

12

estate contract for sale for a property in La Jolla, telling Dr. Markovich she would pay her $700,000 when the sale was final. Moore made monthly payments totaling $72,000 to Dr. Markovich from November 2007 to April 2009. She did not make the $700,000 payment. Berkley later testified he was the sole owner of the La Jolla property listed on the real estate contract and Moore did not have any interest in the property.

Dr. Markovich learned the RB Project did not exist when Moore filed for bankruptcy and listed her as a creditor. Dr. Markovich's attorney missed a filing deadline and the debt was discharged in bankruptcy. (See *In re Owen-Moore* (2010) 435 B.R. 685.)

A forensic use of funds analysis showed that of the $1.837 million received from Dr. Markovich, Moore used $844,410 for personal expenses and $133,727 to support the Brevard Group. She returned $687,270 to Berkley and $172,065 to Anderson from the Markovich funds.

## II.

## DISCUSSION

A. *Claim of Improper Consolidation of Charges*

Moore argues the joinder of the military benefits and Markovich counts to the Berkley/Anderson counts denied her due process of law.

1. *Additional Factual and Procedural Background*

In September 2011, in case No. CD236506, the People filed a four-count felony complaint alleging Moore committed theft offenses against Berkley. In November 2011, in case No. CD237444, the People filed a three-count felony complaint alleging Moore

13

committed theft and elder abuse offenses against Dr. Markovich. In December 2011, the People filed an amended complaint in case No. CD236506 alleging Moore committed theft offenses against Anderson.

On May 16, 2012, the People filed a motion to consolidate the Berkley/Anderson counts with the Markovich counts. In its motion, the People said an additional charge of theft of military survivor benefits would be filed in case No. CD236506. Moore filed an opposition to the People's motion for consolidation.

On June 1, 2012, the trial court ruled that the Berkley/Anderson and Markovich counts involved the same class of crimes as defined in *People v. Kemp* (1961) 55 Cal.2d 458 (*Kemp*). The trial court said the alleged offenses were connected and it would be impossible to separate the evidence. In addition, Moore did not show she would be prejudiced by consolidation. The trial court found that the cases were not highly inflammatory, one was not weaker than the other, and consolidation would conserve judicial resources and public funds. Accordingly, the trial court ordered the Berkley/Anderson and Markovich counts consolidated for trial.

On June 6, 2012, Moore was arraigned on the consolidated complaint, which included a new charge of grand theft of military survivor benefits. Moore did not file a motion to sever the military survivor benefits count from the Berkley/Anderson and Markovich counts.

2.      *Statement of Law and Standard of Review*

"Section 954 provides that an accusatory pleading may 'charge two or more different offenses connected together in their commission . . . *or* two or more different

14

offenses of the same class of crimes or offenses . . . .' " (*People v. Mendoza* (2000) 24

Cal.4th 130, 160 (*Mendoza*).)  Offenses are " ' "connected together in their commission"

when they are [] linked by a " 'common element of substantial importance.' " ' "  (*Id*. at

p. 160; see *Kemp*, *supra*, 55 Cal.2d at p. 476; *Alcala v. Superior Court* (2008) 43 Cal.4th

1205, 1217 (*Alcala*).)  Offenses are of the same class when they possess common

characteristics or attributes.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1030 (*Kraft*).)

"The law prefers consolidation of charges."  (*People v. Ochoa* (2001) 26 Cal.4th

398, 423.)  Consolidation ordinarily avoids the increased expenditure of funds and

judicial resources that may result if the charges are tried in two or more separate trials.

(*People v. Soper* (2009) 45 Cal.4th 759, 772 (*Soper*).)  Where the statutory requirements

for joinder are met under section 954, "a defendant must make a clear showing of

prejudice to establish that the trial court abused its discretion" in granting a motion for

consolidation.  (*Mendoza*, *supra*, 24 Cal.4th at p. 160; *People v. Ochoa* (1998) 19 Cal.4th

353, 409 [same standards apply to motion to consolidate and motion for severance].)  In a

noncapital case, the factors to be considered in a motion for consolidation or severance

are the cross-admissibility of the evidence in separate trials; whether some of the charges

are likely to unusually inflame the jury against the defendant; and whether a weak case

has been joined with a strong case or another weak case so that the total evidence may

alter the outcome of some or all of the charges.  (*Mendoza*, at pp. 160-161.)  These

factors are not of equal weight.  If the evidence on each of the joined charges would have

been admissible under Evidence Code section 1101 in separate trials on the other charges,

then any inference of prejudice is dispelled.  (*People v. Jenkins* (2000) 22 Cal.4th 900,

948 (*Jenkins*).)  In other words, the cross-admissibility of the evidence is sufficient to negate prejudice without any further showing.  (*Ibid.*)

In an appeal from consolidation or denial of severance, we consider the record that was before the trial court at the time of the ruling, not the evidence or arguments that may have developed later.  (*People v. Thomas* (2012) 53 Cal.4th 771, 798; *People v. Ochoa*, *supra*, 19 Cal.4th at p. 409.)  The appellant has the burden of establishing a prejudicial abuse of discretion.  (*People v. Balderas* (1985) 41 Cal.3d 144, 171.)

3.      *Consolidation Is Proper Because the Offenses Are of the Same Class*

The trial court did not err in ruling that the Berkley/Anderson and the Markovich offenses are the same class of crimes.  Although *Kemp*, the case on which the trial court relied, concerns the "connected together in their commission" test under section 954 (*Kemp*, *supra*, 55 Cal.2d at pp. 467-477), case law supports the trial court's finding that the Berkley/Anderson and the Markovich offenses are of the same class.  (*Kraft*, *supra*, 23 Cal.4th at p. 1030 [unrelated homicide offenses are of the same class]; *People v. Lucky* (1988) 45 Cal.3d 259, 276 [robbery and murder charges are of the same class because they share common characteristics as assaultive crimes against the person].)  Embezzlement and theft by false pretenses are varieties of the crime of theft.  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 796 ["theft ' "includes larceny, embezzlement, larceny by trick, and theft by false pretenses" ' "].)  Thus, we are not persuaded by Moore's assertion that the trial court abused its discretion by consolidating the Berkley/Anderson and Markovich counts solely on the basis that each count alleged theft.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315 ["Because both offenses involved

16

murder and thus belonged to the same class of crimes, the statutory requirements for joinder were satisfied."]; *Kraft*, at p. 1030 [stating murder offenses were of the same class].)

4. *Consolidation Is Also Proper Under the "Connected Together in Their Commission" Test*

We reject Moore's argument that consolidation of the Berkley/Anderson and Markovich counts was improper because the offenses were not "connected together in their commission." (§ 954.) We are not persuaded by Moore's argument that the consolidated offenses lack a " 'common element of substantial importance' " (*Kemp*, *supra*, 55 Cal.2d at p. 475), because the Anderson/Berkley counts alleged Moore fraudulently kept money to which she was not entitled, and the Markovich counts alleged Moore fraudulently took money which she otherwise would not have been given. This narrow distinction is not relevant for purposes of determining whether the alleged offenses are "connected together in their commission" (§ 954).

The California Supreme Court states "the Legislature intended *a very broad test* for joinder in employing the language ' "connected together in their commission," as that phrase is used in Section 954.' " (*Alcala*, *supra*, 43 Cal.4th at p. 1217, italics added.) Here, as in other cases, the alleged offenses have the important common element of illegally depriving another person of his or her property. (*Mendoza*, *supra*, 24 Cal.4th at p. 160 [robberies and commercial burglaries all involved the intent to illegally obtain property]; *Lucky*, *supra*, 45 Cal.3d at p. 276 [consolidation is appropriate where the intent

17

to feloniously obtain money from others " 'runs like a single thread through the various offenses' "].)

The evidence in the record shows that the Berkley/Anderson and the Markovich offenses are "connected together in their commission." (§ 954) The time frame within which the consolidated offenses were allegedly committed shows a continuing course of criminal conduct. (*Mendoza*, *supra*, 24 Cal.4th at p. 160.) Forensic evidence establishes that Moore used some of the funds she obtained from Dr. Markovich to cover some of her thefts from Berkley and Anderson, and that she used funds embezzled from Berkley to make payments to Dr. Markovich. Those payments allowed Moore to perpetuate the thefts; they bought her more time and more money. In addition, Moore's victims were similar in that they trusted her. Thus, we conclude that consolidation is also appropriate under the "connected together in their commission" test under section 954.

5.      *Moore Does Not Make a Clear Showing of Potential Prejudice*

Moore does not meet her burden on appeal to make a clear showing of prejudice. The cross-admissibility of the evidence between the Berkley/Anderson and the Markovich counts is sufficient to negate prejudice without any further showing. (*Jenkins*, *supra*, 22 Cal.4th at p. 948.) Here, the evidence would have been admissible under Evidence Code section 1101 in separate trials on each of the counts. Moore used the same bank account in each case. Forensic analysis of her bank account showed she gave a portion of Dr. Markovich's money to Anderson and Berkley. Contrary to Moore's assertion that the forensic accounting evidence was not relevant to show she defrauded Dr. Markovich, the forensic evidence was relevant, if not necessary, to prove that the

18

funds Moore obtained from Dr. Markovich for the RB project were not intended to be, nor were they, used for that purpose. In addition, the forensic evidence shows that Moore used money she embezzled from Berkley to help her make monthly payments to Dr. Markovich, thereby allowing her to fraudulently obtain additional funds from her mother-in-law. Evidence about the RB Project was admissible in both cases. Evidence in each case supports the inference Moore intended to support her lifestyle by taking money from others. Thus, the cross-admissibility of the evidence is sufficient to negate prejudice without any further showing. (*Ibid.*)

The record shows that consolidation of the charges allowed the parties to present and contest the evidence in a single proceeding. Moore's alleged crimes spanned many years. The presentation of forensic evidence concerning Moore's deposits and expenditures in her bank account was detailed and time consuming, and consolidation was in the interests of judicial economy. (*People v. Ochoa*, *supra*, 26 Cal.4th at p. 423; *Soper*, *supra*, 45 Cal.4th at p. 772.) Thus, the trial court did not abuse its discretion when granted the People's motion to consolidate the Anderson/Berkley and Markovich counts.

6. *Moore Has Forfeited the Claim Concerning the Consolidation of the Military Benefits Counts with the Other Counts*

The hearing on the People's motion to consolidate the Anderson/Berkley and Markovich counts was held on June 1, 2012. At the hearing and in its motion, the People stated its intent to file charges against Moore for theft of military benefits. Moore was arraigned on those charges on June 6. Moore did not file a motion to sever the military benefits count from the Anderson/Berkley and Markovich counts. The trial court does

19

not have a sua sponte duty to consider severance. (*People v. Ramirez* (2006) 39 Cal.4th 398, 438.) Thus, Moore has forfeited the argument that the military benefits count was improperly joined with the other counts. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222 (*Dakota H.*) [party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court].)

B.     *Trial Error Claims*

1.     *Character Evidence*

Moore contends the trial court erred in admitting evidence of uncharged crimes, and other character evidence, including evidence about her first marriage, a pregnancy, and an opinion she was a bigamist and a drug abuser. Moore asserts the People used personal allegations about her character to create negative perceptions of her "as a person, a woman, and a mother." She argues the admission of character evidence and evidence of uncharged crimes was prejudicial because it allowed the prosecutor to argue Moore was profoundly dishonest and acted in conformity with her character.

2.     *Legal Principles*

"Character evidence, sometimes described as evidence of propensity or disposition to engage in a specific conduct, is generally inadmissible to prove a person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).)" (*People v. Harris* (2013) 57 Cal.4th 804, 841.) This rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition, such as identity, common plan, or intent. (Evid. Code, § 1101, subd. (b); *People v. Edwards* (2013) 57 Cal.4th 658, 711.) Evidence of uncharged crimes is

20

admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. (*People v. Walker* (2006) 139 Cal.App.4th 782, 796 (*Walker*).)

### 3. *Analysis*

#### a. *Uncharged Acts*

Moore does not support her assertion the trial court erred by admitting evidence of uncharged crimes by appropriate reference to the record. (Cal. Rules of Court, rule 8.204(a)(1)(C) [the statement of any matter in the record shall be supported by appropriate reference to the record].)[5] Instead, Moore cites the prosecutor's closing arguments in support of her assertion. After reviewing the prosecutor's closing argument, we infer Moore is complaining about references to uncharged misconduct in the course of her employment prior to the time period alleged in the indictment: July 30, 2003, to March 13, 2009, in the Berkley counts; and August 8, 2003, to August 29, 2008, in the Anderson counts.

Statements by counsel are not evidence. (*People v. Richardson* (2008) 43 Cal.4th 959, 1004.) "It is not the duty of a reviewing court to search the record for evidence on a point raised by a party whose brief makes no reference to the pages where *the evidence can be found*." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011, italics added.) We deem this issue forfeited on appeal. (*In re S.C.* (2006) 138

---

[5]     Further rule references are to the California Rules of Court.

21

Cal.App.4th 396, 406-407 [when an appellant's brief makes no references to support the claims, the reviewing court can simply deem the contention to lack foundation and, thus, to be forfeited].)

Even if the issue was not forfeited, any evidence showing that Moore started diverting Anderson/Berkley rent checks to her own account prior to July or August 2003 would have been admissible to show identity, common design or plan, or intent. The charged and any uncharged crimes in the Anderson/Berkley counts were identical in nature, and show a continuous course of conduct. (*Walker*, *supra*, 139 Cal.App.4th at p. 796.)

> b.     *The Court Did Not Err When It Allowed Owen to Testify*

The defense objected to the testimony of Moore's former husband, John Owen, stating it was not relevant. The trial court ruled the evidence was relevant to show a starting point for Moore's income, and was not unduly prejudicial.

Moore and Owen started living together in 1990, married in 1995, separated in 1997, and divorced in 2002. Owen testified Moore worked for a property management company when they were married. They were not wealthy and lived paycheck to paycheck. Owen and Moore lived in a rented apartment. Owen had no knowledge of Moore's finances after they separated in 1997. He did not see any change in her economic circumstances from 1997 to 2002.

On appeal, Moore argues Owen's testimony had no probative value and created a danger of undue prejudice.[6] (Evid. Code, § 352.) She complains his testimony informed the jury Moore "had been married multiple times, playing on an obviously sexist trope that oft-remarried women are manipulative or gold-diggers, certainly flawed, and morally suspect."

We conclude that the trial court properly exercised its discretion in admitting Owen's testimony under Evidence Code section 352. Owen's limited testimony tended to show Moore came from modest circumstances and was not financially independent. His testimony was relevant to show Moore's only income was from her employment and she did not have other financial resources. We reject Moore's speculative claim that evidence of her marriage to Owen was prejudicial because the jury would infer she was a gold-digger. Owen did not cast Moore in a bad light. Evidence is not prejudicial under Evidence Code 352 "merely because it undermines the opponent's position or shores up that of the proponent." (*People v. Doolin* (2009) 45 Cal.4th 390, 438.)

c.   *Moore Has Forfeited the Claim of Error in Admitting Character Evidence in the Markovich Conditional Examinations*

The defense objected to the admission of Dr. Markovich's and Cdr. Markovich's statements concerning Moore's marriages and birth of her child with Robert Moore, and

---

6   Despite its inclusion in the portion of appellant's opening brief addressing claims of admission of improper character evidence, Owen's testimony did not show Moore had any propensity to commit misconduct, and was not character evidence as defined in Evidence Code section 1101, subdivision (a). Under rule 8.204(a)(1)(B), the argument should have been structured under its own heading. We disregard the noncompliance. (Rule 8.204(e)(2)(C).)

Dr. Markovich's opinions about Moore's character. The parties agreed to redact the objectionable material from the videotapes and transcripts of the conditional exams.

After the edited videotapes were shown to the jury, the trial court said to counsel, "We are outside the presence of the jury. Gentlemen, I have to admit I think you should go back to film school for editing purposes. I thought we'd edited some of that stuff out."

The prosecutor said, "I edited out what [the defense] wanted out."

The court responded, "Okay. As long as both sides want it, that's fine. I just was a little surprised." Defense counsel did not object.

Moore's argument is wholly without merit. The appellant has the burden to provide an adequate record on appeal to allow the reviewing court to assess the purported error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.) Although Dr. Markovich's and Cdr. Markovich's original conditional examinations are in the appellate record, the portions of their conditional examinations that were admitted in evidence are not in the appellate record. Therefore, this court cannot assess the purported error, if any. (*Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 955 [a reviewing court will "decline to find error on a silent record"].)

Second, the record shows that Moore had an opportunity to redact objectionable material from the conditional examinations that were admitted into evidence. Here, the prosecutor told the trial court he "edited out what [the defense] wanted out" from the conditional examinations. Moore did not object to any evidence that was presented to the jury in the edited conditional examinations. Thus, Moore has forfeited the argument on appeal. (*Dakota H.*, *supra*, 132 Cal.App.4th at pp. 220-221.)

24

C.      *The Berkley/Anderson Counts*

Moore asks this court to set aside the convictions on the Berkley/Anderson counts. She argues she was deprived of the testimony of a key defense witness in violation of her Sixth Amendment right to compulsory process. Moore contends counts 2 and 4 (embezzlement) should be set aside as duplicative of counts 1 and 3 (grand theft). Moore further contends counts 1 and 3 should be set aside because the People introduced evidence that was obtained through an invalid search warrant, and the trial court erred when it allowed a police detective to opine Moore was engaged in a criminal enterprise.

1.      *The Right to Compel the Presence of a Witness*

Moore contends the prosecutor committed misconduct by interfering with her constitutional right under the Sixth Amendment to call a key defense witness, Max Gascoine, to testify on her behalf. Moore contends Gascoine's testimony would have supported her claim that the money she allegedly embezzled was reimbursement for expenses she incurred on her employers' behalf. According to Gascoine, Berkley was a micromanager who closely reviewed financial information and directed Moore to commingle funds in various banks accounts. Moore argues the prosecutor committed misconduct by arresting Gascoine during the course of the investigation into Moore's criminal case, threatening Gascoine with prosecution during his conditional examination, failing to grant him immunity, and turning him over to federal authorities for deportation before trial. Moore further contends the trial court violated her rights under the Sixth Amendment by excluding Gascoine's conditional examination from evidence.

25

a.    *Additional Factual and Procedural Background*

In 1998, Berkley hired Gascoine for a sales position with one of his companies. At that time, Moore was employed as a receptionist. According to Gascoine, Moore was not good with computers. He began to help her input financial information into a software program and produce spreadsheets. Gascoine continued to help Moore with accounting work until approximately 2006, when he left to start his own business. When Moore filed for bankruptcy, she hired Gascoine to help prepare bankruptcy records, schedules and statements of accounts. He later helped her prepare for her criminal case.

After Moore was indicted, Gascoine signed a statement asserting he witnessed Berkley instruct Moore to personally pay expenses that he did not want on the books. Gascoine said Berkley directed him to code Berkley's personal expenses as business expenses, and to send misleading transaction histories to Anderson's certified public accountant. He also stated Berkley instructed Moore to commingle funds from various business accounts.

Gascoine's signed statement was brought to the prosecutor's attention. During his investigation, the prosecutor learned Gascoine was in the country illegally and was using another person's Social Security number. The prosecutor charged Gascoine with identity theft. He pleaded guilty and was subject to deportation after sentencing.

Moore noticed a conditional examination for Gascoine, who was in local custody awaiting sentencing. The trial court was concerned about proceeding in the absence of Gascoine's criminal trial lawyer (Counsel), and continued the proceedings to allow Counsel to be present.

26

At the conditional examination, which occurred after Gascoine was sentenced, Counsel generally objected to the examination going forward, stating he had advised Gascoine to assert his privilege against self-incrimination. Counsel could not identify any area of questioning that would place Gascoine at risk of self-incrimination. The trial court overruled the objection as speculative, and said if Gascoine were placed at risk in the examination, the court would allow him to claim the privilege if he clearly was going to incriminate himself.

At the conditional examination, Gascoine testified about Berkley's business practices, his monthly review of financial information, and Moore's lack of expertise with computer software. Gascoine said he prepared routine reports, attached them to bank statements with the cancelled checks, and gave them to Berkley for his review.

On redirect, the defense questioned Gascoine about a signed addendum to his first statement. In the addendum, Gascoine claimed he deposited money at Berkley's direction into various bank accounts, including receipts from Burlington Coat Factory tenants in the TGC bank account, in Moore's absence. The prosecutor objected to the questioning on the ground the addendum had not been disclosed to the People. The trial court directed the defense to provide a copy to the prosecution.

When court proceedings resumed, defense counsel told the trial court the prosecutor had engaged in witness intimidation by providing police reports to Counsel to deliver to Gascoine before he resumed testifying. The prosecutor confirmed he had provided Counsel with the addendum and two police investigative reports. The prosecutor said Gascoine's statement showed he knew about the accounting and

27

reconciliation of the TGC account, which Moore used to facilitate a major part of her embezzlement. The prosecutor told the trial court he felt obligated to inform Counsel instead of proceeding with questioning that could potentially lead to Gascoine's criminal liability for aiding and abetting Moore's fraud.

Counsel asked for more time to review the documents with Gascoine. He said he would "absolutely" advise Gascoine to assert his right against self-incrimination in view of the documents he had just received and the district attorney's representations. The trial court suggested the prosecutor could grant immunity to Gascoine. The prosecutor replied he did not have the authority. The trial court said the prosecutor was not trying to intimidate the witness and continued the proceedings to allow Counsel to review the police reports with Gascoine.

At the continued hearing, Gascoine invoked his privilege against self-incrimination. Defense counsel asked the trial court to order the prosecution to grant immunity to Gascoine. The trial court said it was without authority to do so. Gascoine was deported before Moore's trial began.

During pretrial proceedings, the prosecution moved to exclude Gascoine's conditional examination from evidence. Over defense objection, the trial court granted the motion and rejected the defense's suggestion that the trial court admit portions of Gascoine's testimony. The trial court said it would reconsider its ruling if the parties agreed on which portions should be admitted. There is no indication in the record that the parties ever reached an agreement to admit into evidence a portion of Gascoine's testimony.

28

b.     *Legal Principles*

The Sixth Amendment to the United States Constitution sets forth several fundamental protections for criminal defendants, including the right to compel the testimony of those who have favorable evidence.  (*People v. Jacinto* (2010) 49 Cal.4th 263, 268 (*Jacinto*); U.S. Const., 6th Amend. ["in all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor"].)  "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law."  (*Washington v. Texas* (1967) 388 U.S. 14, 19.)

"This constitutional guarantee, generally termed the compulsory process clause, applies in both federal and state trials.  (*Washington v. Texas*[, *supra*,] 388 U.S. 14 [6th Amend.'s compulsory process clause is incorporated into the 14th Amend.'s due process clause, making it applicable in state prosecutions].)"  (*Jacinto*, *supra*, 49 Cal.4th at p. 268.)  The California Constitution similarly guarantees compulsory process as a basic component of a fair trial.  (*In re Martin* (1987) 44 Cal.3d 1, 30 (*Martin*).)

"A criminal defendant's rights under the compulsory process clause can be infringed in several ways.  'They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the

29

course of their testimony. [Citations.] They also include statements to defense witnesses warning they would suffer untoward consequences in other cases if they were to testify on behalf of the defense. [Citations.] Finally, they include arresting a defense witness before he or other defense witnesses have given their testimony.' ([*Martin*], *supra*, 44 Cal.3d at pp. 30-31.)" (*Jacinto*, *supra*, 49 Cal.4th at p. 269.)

To prevail on a claim of prosecutorial violation of the right to compulsory process, a defendant must establish three elements. (*In re Williams* (1994) 7 Cal.4th 572, 603.) First, the defendant must show the prosecutor's conduct was "entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify." (*People v. Mincey* (1992) 2 Cal.4th 408, 460 (*Mincey*); *In re Williams*, at p. 603; *People v. Lucas* (1995) 12 Cal.4th 825A, 457 (*Lucas*). The defendant is not required to show that the prosecutor acted in bad faith or with improper motives. (*Martin*, *supra*, 44 Cal.3d at p. 31.)

If prosecutorial misconduct is established, the defendant must show the misconduct was a substantial cause in depriving the defendant of the witness's testimony. (*Martin*, *supra*, 44 Cal.3d at p. 31.) The defendant "is not required to prove that the conduct under challenge was the 'direct or exclusive' cause. . . . Rather, he need only show that the conduct was a substantial cause. . . . The misconduct in question may be deemed a substantial cause when, for example, it carries significant coercive force . . . and is soon followed by the witness's refusal to testify . . . ." (*Ibid.*, citations omitted.) Finally, if causation is shown, the defendant must demonstrate "the testimony he was unable to present was material to his defense." (*Lucas*, *supra*, 12 Cal.4th at p. 457.)

30

c.      *Analysis*

Moore's argument the prosecutor committed misconduct by arresting Gascoine and by facilitating his deportation is wholly without merit. Gascoine's arrest did not turn him into an unwilling witness. Gascoine testified at length in his conditional examination before the defense introduced his addendum without having provided it to the prosecution. Moreover, the parties were fully aware of Gascoine's pending deportation. The defense noticed Gascoine's conditional examination precisely because she knew he was likely to be deported after he was sentenced. The prosecutor did not object when the defense asked the trial court to declare Gascoine to be a material witness and delay his remand into federal custody. When the trial court delayed the conditional examination to allow Gascoine to consult with Counsel, the prosecution asked the trial court to issue an order to produce him for the continued hearing.

In addition, Moore has forfeited the argument the prosecutor committed misconduct by facilitating Gascoine's deportation. (*Dakota H.*, *supra*, 132 Cal.App.4th at pp. 121-122.) After Gascoine asserted his Fifth Amendment rights, the trial court said it was not going to hold him as a material witness, subjecting him to deportation. The defense attorney responded, "As a practical matter, if he's not going to testify under the advi[c]e of counsel, even keeping him here for prelim or trial would be a futile gesture and not practical under the circumstances."

Similarly, we are not impressed with the argument that the prosecutor committed misconduct by refusing to grant immunity to Gascoine. Moore asserts defense counsel asked the prosecutor to grant immunity. Our review of the record shows when Counsel

31

said he would advise Gascoine to assert his right against self-incrimination (after reviewing the police reports), the trial court said, "There is the practical aspect, but the [district attorney] could give him immunity."

The prosecutor responded, "I don't have that authority to do that at this time, Your Honor."

The trial court said, "I know you don't."

Defense counsel remained silent during this discussion about immunity, and has forfeited this argument on appeal. (*People v. Arias* (1996) 13 Cal.4th 92, 159 (*Arias*) [failure to object waives a misconduct claim on appeal unless an objection would have been futile]; see also *In re Williams*, *supra*, 7 Cal.4th at p. 609 [California cases uniformly reject claims that a criminal defendant has the power to compel testimony by forcing the prosecution to grant immunity].) Several days later, defense counsel asked the trial court to order the prosecution to provide judicial immunity to Gascoine. The trial court declined, stating such an order would violate the doctrine of separation of powers. Moore has not challenged this ruling on appeal. (See *Lucas*, *supra*, 12 Cal.4th at p. 461 [expressing doubt the trial court has inherent authority to grant immunity]; *In re Williams*, at p. 610 [vast majority of cases in California and other jurisdictions reject the notion a trial court has inherent power to confer immunity on a witness called by the defense].)

Moore raised the issue of prosecutorial misconduct after learning the prosecutor provided police reports to Counsel. She now contends in providing those reports, the prosecutor was threatening Gascoine with prosecution should he testify on Moore's

32

behalf. Our analysis is informed by the California Supreme Court's decision in *Lucas*. In that case, the defendant argued the prosecutor, through intimidation and threats, transformed witnesses who were willing to testify on the defendant's behalf into witnesses who refused to testify. (*Lucas*, *supra*, 12 Cal.4th at p. 457.)

In *Lucas*, the trial court raised the issue whether witness A should be represented by independent counsel. In A's presence, the prosecutor said witness A had a prior narcotics conviction and was a suspect in another matter. The defense claimed the prosecutor's remarks were a threat to prosecute witness A should he testify for the defense. (*Ibid*.) The trial court also raised concerns that witness B might incriminate himself and insisted the second witness consult independent counsel. The prosecutor, without addressing witness B or threatening prosecution, said there was no evidence to show that more than one person was involved in the crime, however, someone who testified he was with the defendant shortly before the crime occurred could not be ruled out as an accomplice. (*Id*. at p. 458.)

The *Lucas* court ruled with respect to witness A, the record clearly showed it was the trial court, not the prosecutor, who raised concerns about the possibility that witness A would incriminate himself. Further, the prosecutor's comments were not threats directed to witness A. As to witness B, the *Lucas* court said: "In any event, whether or not it was proper for the prosecutor to point out in front of the witness that the latter could not be ruled out as an accomplice under the facts of the case, it is clear that the prosecutor's comment was not a substantial cause of the witness's decision to refuse to testify. Rather, the record demonstrates that *before* the prosecutor made the allegedly

33

coercive statement, [the witness's] counsel had already advised [the witness] to invoke his privilege against self-incrimination . . . ." (*Lucas*, *supra*, 12 Cal.4th at p. 458.)

Here, the trial court, not the prosecutor, raised concerns that Gascoine might incriminate himself. The trial court continued the conditional examination until Counsel was present. Counsel objected to the examination, stating he had advised Gascoine to invoke his privilege against self-incrimination. At that point in time, Counsel was not aware of any information that would tend to incriminate Gascoine, and the trial court overruled Counsel's objection. The trial court said if Gascoine were placed at risk in the examination, the court would allow him to claim the privilege. When the prosecutor learned Gascoine had signed an addendum that could be interpreted as implicating him in Moore's criminal activities, the prosecutor turned over the statement and two law enforcement investigative reports to Counsel.

As in *Lucas*, it is clear the trial court was the first to raise the possibility Gascoine might incriminate himself were he to testify. Although the trial court initially was more concerned about the effect of incrimination in Gascoine's own criminal proceedings, the trial court said Gascoine could assert the privilege if he was placed at risk during the examination. Like *Lucas*, in providing material to Gascoine's counsel, the prosecutor merely offered information relevant to this concern. "[T]he prosecutor's comments were not threats directed to the witness. (Cf. *People v. Warren* (1984) 161 Cal.App.3d 961, 971-976 [threat that witness would be prosecuted for any crimes revealed in testimony]; *People v. Robinson* (1983) 144 Cal.App.3d 962, 970 [threat that charges will be filed]; *United States v. Hammond* (5th Cir.1979) 598 F.2d 1008, 1012-1013 [threat of 'untoward

consequences' if witnesses testified].)" (*Lucas*, *supra*, 12 Cal.4th at p. 458.) After reviewing the documents with Counsel, Gascoine invoked his right against self-incrimination. Under these circumstances, as in *Lucas*, it was obvious no competent attorney would have advised the witness to testify. (*Lucas*, at p. 458.)

Further, the prosecutor's delivery of Gascoine's signed statement and police reports to Counsel was in keeping with the trial court's concerns about Gascoine's constitutional rights. The record does not indicate the prosecutor engaged in conduct that was "entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify." (*Mincey*, *supra*, 2 Cal.4th at p. 460.) Rather, the record shows the prosecutor acted in a manner that safeguarded the protections afforded to Gascoine by the right to counsel and the right to avoid self-incrimination. (*Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, 1262, citing *Maine v. Moulton* (1985) 474 U.S. 159, 171.) Moore's right to compulsory process under the Sixth Amendment was not violated.

2. *The Trial Court Did Not Err in Excluding Gascoine's Conditional Examination*

Moore contends the trial court abused its discretion by excluding Gascoine's conditional examination from evidence. Relying on cases examining the admission or exclusion of newspersons' testimony in criminal cases under the shield law, Moore argues the trial court erred when it did not balance the relevant factors in determining whether Gascoine's conditional examination would be admitted in evidence, and further erred by

not considering less drastic alternatives other than striking Gascoine's conditional examination in its entirety.

The People state the trial court properly excluded Gascoine's testimony under Evidence Code sections 352[7] and 356,[8] and argue the straightforward application of state evidentiary rules does not implicate a defendant's constitutional rights. The People further contend in view of the overwhelming evidence of Moore's guilt, any error in excluding Gascoine's conditional examination was harmless beyond a reasonable doubt.

      a.    *Additional Factual and Procedural Background*

In ruling on the People's motion to exclude Gascoine's testimony, the trial court said:

> "Max Gascoine. That was a very interesting hearing that we held with him, and the fact that he invoked his Fifth Amendment rights. Actually, he invoked them during what I would deem to be the more critical questions regarding this case. . . . His prior testimony was broad, unfocused and not as pertinent to the questions that he invoked his Fifth on, and that concerns me a lot. And since he's not here, it would not be fair to either party because he has as many questions unanswered as he does questions that he answered. So based on that, his testimony is out. . . . I thought about trying to go through and cherry pick things out. That gets into a big problem."

---

7     "A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)

8     "The purpose of [Evidence Code section 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*Arias*, *supra*, 13 Cal.4th at p. 156.)

36

Defense counsel responded: "There might be a bright line prior to redirect — or recross."

The Court said:

"If you two can . . . find something you both can agree on, I'll revisit it, but there is a huge [Evidence Code section] 356 issue. And as I indicated, he kind of shut down at the point where I would say I was kind of perking up, because those really were the questions that needed to be answered. . . . So I am always open to revisiting rulings . . . . I want to give you both a fair trial, and I want to give the jurors the information they need to make a decision. But this is a very good example of my primary responsibility . . . to keep both of you focused on presenting the relevant information for the jury to make their decision, not to go off on tangents . . . ."

b.    *Legal Principles*

A defendant has a constitutional right to have compulsory process for obtaining witnesses in his favor.[9] (U.S. Const., 6th Amend.; *Jacinto*, *supra*, 49 Cal.4th at p. 268.) This right "cannot be deemed to include the right to call a witness who cannot be subjected to proper cross-examination." (*Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 736 (*Fost*).) When a defense witness invokes his or her right against self-incrimination, especially after the witness has testified on direct, the People cannot " ' " 'fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which

---

[9]    Contrary to Moore's assertion, the factors used to determine whether to compel a newsperson to testify in a criminal trial are not applicable here. (See *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 808-813.) Those factors are used by the defendant to overcome a prima facie showing by a newsperson that he or she is entitled to withhold information under the shield law. (*Id*. at p. 808.)

explains or refutes his statements or the inferences which may necessarily be drawn from them.' " ' " (*People v. Seminoff* (2008) 159 Cal.App.4th 518, 525 (*Seminoff*), quoting *People v. Reynolds* (1984) 152 Cal.App.3d 42, 46 (*Reynolds*).)

"Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct." (*Fost*, *supra*, 80 Cal.App.4th at p. 735.)  Striking the direct examination is a proper remedy. However, the court should exercise some discretion in the matter.  (*People v. Sanders* (2010) 189 Cal.App.4th 543, 554 (*Sanders*), citing 1 McCormick, Evidence (6th ed. 2006) Cross-examination, § 19, pp. 110, 111.)

In deciding whether to strike the testimony of a defense witness who has refused to answer one or more questions, the trial court should examine the motive of the witness and the materiality of the answer.  (*Reynolds*, *supra*, 152 Cal.App.3d at p. 47.)  The trial court should also consider if "less severe remedies are available before employing the 'drastic solution' of striking the witness's entire testimony." (*Seminoff*, *supra*, 159 Cal.App.4th at p. 526.)  Alternatives "include striking part of the testimony or allowing the trier of fact to consider the witness's failure to answer in evaluating his credibility." (*Ibid*.)  "Striking a witness's entire testimony is, of course, a 'drastic solution,' only to be employed 'after less severe means are considered.' " (*Fost*, *supra*, 80 Cal.App.4th at p. 736.)

c.      *Analysis*

We reject the argument that the trial court should not have stricken Gascoine's entire testimony because the People had the opportunity to cross-examine him.  Gascoine,

who testified as a defense witness, asserted his Fifth Amendment right on redirect after defense counsel introduced Gascoine's prior statement stating that Berkeley had directed him to deposit tenants' checks in the TGC bank account in Moore's absence, but before the prosecution had the opportunity to cross-examine him. The issue had not arisen during the direct examination and cross-examination. The trial court found that Gascoine's statement was directly relevant to the charges against Moore whereas his prior testimony was broad and unfocused.

The record belies Moore's contention the trial court did not consider other remedies other than completely striking Gascoine's testimony. The trial court considered admitting selected portions of Gascoine's conditional examination but determined such "cherry-picking" would contravene Evidence Code section 356, which provides that "if part of an act, conversation, declaration, or writing is placed in evidence, the adverse party may inquire into 'the whole *on the same subject*.' " (*Arias*, *supra*, 13 Cal.4th at p. 156.) The trial court informed the parties if they reached an agreement to admit a portion of Gascoine's conditional examination at trial, the trial court would revisit its exclusionary ruling.

In *Sanders*, the reviewing court said "there is solid support, both judicial and scholarly, for the proposition that when one or two questions asked during cross-examination are at stake and those questions relate to a collateral matter such as the nonparty witness's credibility, the trial court need not strike the entirety of that witness's direct testimony." (*Sanders*, *supra*, 189 Cal.App.4th at p. 556.) For example, in *People v. Robinson* (1961) 196 Cal.App.2d 384, a witness refused to identify the buyer of the

39

stolen property, the trial court struck the portion of the witness's testimony relating to the disposition of the stolen articles. (*Id.* at p. 386.) In upholding the *Robinson* court's decision not to strike the witness's entire testimony, the reviewing court said " 'the witness refused to answer but one question which, though relevant to the credibility of the witness, had no bearing on the actual elements of the crime of burglary with which the defendant was charged.' (*Id.* at p. 389.)" (*Reynolds*, *supra*, 152 Cal.App.3d at p. 48.)

Here, the trial court did not abuse its discretion in striking Gascoine's entire testimony. Gascoine refused to testify about matters that were relevant to the actual elements of embezzlement and theft. He did not refuse, as did the witness in *People v. Robinson*, *supra*, 196 Cal.App.2d 384, 386, to answer one or two questions that had no bearing on the defendant's innocence or guilt. Rather, Gascoine asserted his right against self-incrimination, which prevented any cross-examination on matters going to the heart of the Anderson/Berkley charges against Moore. Excluding Gascoine's conditional examination, although drastic, was a legitimate response to his refusal to answer any additional questions about his statement about Moore's practice of depositing checks from Berkley's tenants into the TGC account. In view of the totality of the circumstances, we cannot conclude that the trial court abused its discretion when it determined there were no reasonable alternatives other than excluding the entirety of his testimony. (*Fost*, *supra*, 80 Cal.App.4th at p. 735 ["Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct."].)

40

3.  *Given the Jury Instructions, Moore May Not Be Convicted of Both Grand Theft and Embezzlement*

Moore contends she cannot be convicted of both grand theft of personal property (§§ 484, 487) and embezzlement by a clerk, agent or employee (§ 508) because they are the same crime and, in her circumstances, were based on the same conduct. She argues embezzlement is not an independent crime but merely an alternative definition of theft. Moore maintains that section 508 merely clarifies the definition of embezzlement as a variety of theft under section 484 and does not constitute a separate offense.[10]

a.  *Legal Principles and Standard of Review*

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citations.]' [Citation.] Section 954 generally permits multiple conviction." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226-1227 (*Reed*).) "A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' " "If the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*Ibid.* at p. 1227; *id.* at pp. 1229, 1231.)

---

[10]  In support of her argument that grand theft and embezzlement are not separate offenses, Moore relies on *People v. Vidana* (2015) 233 Cal.App.4th 666, review granted April 1, 2015, S224546. The California Supreme Court is currently reviewing whether a person can be convicted of both embezzlement and grand theft by larceny for the same conduct, or only of the single crime of theft. As we explain, because the jury instructions here included theft by embezzlement, we need not reach this issue.

41

"Theft is the unlawful taking of the property of another" and "includes the crimes of larceny, embezzlement, larceny by trick and device and obtaining property by false pretenses." (*People v. Creath* (1995) 31 Cal.App.4th 312, 318.) Under section 484, "[e]very person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft. . . ." (§ 484, subd. (a).) As relevant here, grand theft is theft of money in excess of $950. (§ 487, subd. (a).)

Theft offenses have been consolidated into the single crime of theft under section 484, but their respective elements have not been changed. (*People v. Williams* (2013) 57 Cal.4th 776, 786; *People v. Ashley* (1954) 42 Cal.2d 246, 258 ["The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law."].) A "judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses." (*People v. Ashley*, *supra*, at p. 258.)

Embezzlement is the fraudulent appropriation of property by a person to whom it has been entrusted. (§ 503.) Under section 508, "[e]very clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent

42

to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment as such clerk, agent, or servant, is guilty of embezzlement." (*Ibid.*) "The crime of embezzlement requires the existence of a 'relation of trust and confidence,' similar to a fiduciary relationship, between the victim and the perpetrator." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1845.)

Theft by larceny is committed by " 'every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away.' " (*People v. Brock* (2006) 143 Cal.App.4th 1266, 1275 (*Brock*).) Theft by false pretenses, unlike larceny, has no requirement of asportation. Theft by false pretenses requires only that " '(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' " (*People v. Williams*, *supra*, 57 Cal.4th at p. 787.)

Moore's contention that she cannot be convicted for embezzlement under section 508 and embezzlement as a variety of theft under section 484 raises a question of law, which we review de novo. (*In re Taylor* (2015) 60 Cal.4th 1019, 1035.)

b. *Additional Factual and Procedural Background*

In an amended information, the People charged Moore with two counts of grand theft and personal property from Berkley and Anderson in violation of section 487, subdivision (a) (counts 1 & 3) and two counts of fraudulent appropriation by clerk, agent, or employee in violation of section 508 (counts 2 & 4). In addition, counts 5 and 6

43

alleged grand theft from federal government agencies, and count 8 alleged grand theft from Dr. Markovich.

The defense objected to a jury instruction treating all thefts as if they were the same, arguing such an instruction would allow the jury to apply all theories of theft to each charge whether justified by the evidence or not. The defense requested a different instruction for each count of theft, based on the theory of theft applicable to that count.

The prosecutor stated, "I think the jury is entitled to be instructed on all different theories of theft that can apply in this case based on their understanding and determination of what the facts are." The prosecutor said the instruction was merely designed to tell the jury what the applicable law is.

The trial court said it liked the simplicity of presenting the different theories of theft to the jury, and instructed the jury: "The defendant has been prosecuted for grand theft under Counts 1, 3, 5, 6, & 8 under several theories: grand theft by larceny, grand theft by embezzlement, and grand theft by false pretenses. [¶] Each theory of theft has different requirements. [¶] You may not find the defendant guilty of theft unless all of you agree that the People have proved that the defendant committed theft under at least one theory. But all of you do not have to agree on the same theory." The instructions then set forth the definitions of grand theft by larceny, grand theft by embezzlement, and grand theft by false pretenses.

The trial court also instructed the jury: "The defendant is charged in Counts 2 & 4 with fraudulent appropriation by a clerk, agent or employee in violation of . . . section 508. To prove that the defendant is guilty of each of these crimes, the People must prove

44

that:  [¶]  1. The defendant was an employee/agent of William Berkley under Count 2; / Richard Anderson under Count 4;  [¶]  2. The defendant committed grand theft by embezzlement of property with a value in excess of $950 or more from William Berkley under Count 2/ from Richard Anderson under Count 4; and  [¶]  3. The property taken came into the defendant's control by virtue of her employment."  The jury also received CALCRIM No. 1806, which describes the elements of embezzlement under sections 484 (theft) and 503 (embezzlement).

In instructing the jury about the elements of proof of grand theft by embezzlement and embezzlement, each of the three jury instructions stated:  "[T]he People must prove:  [¶]  1. An owner or the owner's agent entrusted his property to the defendant;  [¶]  2. The owner or owner's agent did so because he trusted the defendant;  [¶]  3. The defendant fraudulently converted or used that property for her own benefit;  [¶]  AND  [¶]  4. When the defendant converted or used the property, she intended to deprive the owner of its use."

During closing argument, the prosecutor told the jury there were three different theories of theft that applied under counts 1, 3, 5, 6 and 8 — theft by larceny, theft by embezzlement, and theft by false pretenses.  The jury could use multiple theories or a single theory to determine that the defendant unlawfully took money from the people named in the counts.

In verdict forms for counts 1 and 3 (grand theft), the jury found the defendant guilty of the crime of grand theft of personal property, in violation of section 487, subdivision (a).  In counts 2 and 4 (embezzlement), the jury found the defendant guilty of

45

the crime of fraudulent appropriation by clerk, agent or employee, in violation of section 508.

c.    *Analysis*

Moore contends she cannot be convicted of both grand theft of personal property (§§ 484, 487) and embezzlement by a clerk, agent or employee (§ 508) because they are the same crime and in her circumstances, were based on the same conduct.  She argues embezzlement is not an independent crime but merely an alternative definition of theft.

We reject the argument that embezzlement is merely a variety of theft and not an independent crime.  "[T]he California Legislature's consolidation of larceny, false pretenses, and embezzlement into the single crime of theft did not change the elements of those offenses . . . ."  (*People v. Williams*, *supra*, 57 Cal.4th at p. 786.)  " 'Although the offense of theft has been substituted for the offenses of larceny, embezzlement and obtaining money or property by false pretenses, no elements of the former crimes have been changed.  The elements of the former offenses of embezzlement and larceny and the distinction between them' continue to exist."  (*People v. Nazary* (2010) 191 Cal.App.4th 727, 741 (*Nazary*).)  In *Nazary*, this court held that a defendant may be convicted of both embezzlement, in violation of section 508, and grand theft by an employee, in violation of section 487, subdivision (b)(3).  (*Nazary*, at p. 742.)  This court stated, "[T]he offense of grand theft by an employee is essentially the same as the offense of grand theft by larceny, with the additional finding that the defendant was an employee of the victim."  (*Id*. at p. 741.)

46

Here, in contrast to *Nazary*, the jury instructions for grand theft did not contain an instruction for grand theft by employee, which does not require the property to have been entrusted to the defendant, and is therefore a different crime than embezzlement. (*Nazary*, *supra*, 191 Cal.App.4th at p. 742.)  Instead, the jury was given an instruction on "grand theft by embezzlement," which included, word for word, the same elements necessary to sustain a conviction on a charge of embezzlement.  Thus, Moore's argument her convictions for grand theft and embezzlement were based on the same conduct and describe the same crime has merit.

"In deciding whether multiple conviction is proper, a court should consider only the statutory elements."  (*Reed*, *supra*, 38 Cal.4th at p. 1229.)  "Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former."  (*Id.* at p. 1227.)  Here, the jury instruction on the crime of grand theft by embezzlement included all the elements of embezzlement.  Under the elements test set forth in *Reed*, we conclude that multiple conviction on theories of grand theft by embezzlement and embezzlement based on the same set of facts is improper.

When one of the theories presented to a jury is legally inadequate, reversal generally is required unless " 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' "  (*People v. Perez* (2005) 35 Cal.4th 1219, 1233 (*Perez*).)  In addition to a theory of grand theft by embezzlement, the jury was instructed on theories of grand theft by larceny and grand theft by false pretenses.  Here, the record does not indicate on which theory or theories

47

the jury convicted Moore of grand theft on counts 1 and 3.[11] " '[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand.' " (*Brock*, *supra*, 143 Cal.App.4th at p. 1282.)  Accordingly, we reverse Moore's convictions for grand theft by embezzlement on counts 1 and 3.

Because we determine defendant's convictions for grand theft (counts 1 & 3) must be set aside, we need not consider the argument her convictions on counts 1 and 3 should be reversed because the People introduced evidence that was obtained through an invalid search warrant, and the trial court erred when it allowed a police detective to opine Moore was engaged in a criminal enterprise.[12]

---

[11]  Another theory of theft that was presented to the jury, grand theft by larceny, requires trespass, and does not appear to be factually supported by the evidence. "[W]hen one of the theories presented to a jury is factually inadequate, such as a theory that, while legally correct, has no application to the facts of the case, we apply a different standard. [Citation.]  In that instance, we must assess the entire record, 'including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.' [Citation.]  We will affirm 'unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory.' " (*Perez*, *supra*, 35 Cal.4th at p. 1233.)

[12]  In her reply brief, Moore argues the admission of illegally obtained evidence and the detective's opinion tainted the entire trial.  We need not address arguments raised for the first time in the reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764; *Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 471, fn. 19 [declining to address additional claims with respect to an argument raised in the opening brief].)

D.      *The Military Benefits Count*

Moore contends her conviction for grand theft from the DFAS Survivor Benefit Plan should be set aside.  Moore argues the establishment and enforcement of the Survivor Benefit Plan is exclusively within the province of the federal government, and a state court lacks jurisdiction to consider whether a person has defrauded the federal government.  Alternatively, she contends the federal government is not "a person" within the meaning of the Penal Code, which states "the word 'person' includes a corporation as well as a natural person."  (§ 7.)

1.      *Additional Factual Background*

As we have discussed, the Survivor Benefit Plan is a monthly entitlement paid to a surviving spouse or the family of a person who dies on active duty.  (10 U.S.C. §§1447-1455.)  A surviving spouse who remarries before the age of 55 years is no longer entitled to receive benefits.  (10 U.S.C. § 1450(b)(2).)  To determine continued eligibility, a surviving spouse is required to sign a Certificate of Eligibility (COE) form every year.

After remarrying, Moore signed six COE forms.  In each form, she checked a box stating "I did not marry in the past year."  Each COE form stated, "Penalty for presenting false claims or making false statements in connection with claims.  Fine of not more than $10,000 or imprisonment for not more than 5 years, or both ([18 U.S.C. §] 1001)."

Moore, who is less than 55 years old, received a total of $74,829 from DFAS while remarried.

49

2.	*Legal Principles and Standard of Review*

Moore contends the state lacks jurisdiction to prosecute violations of the Survivor Benefit Plan.  She argues:  (1) the governing statute empowers the Secretary of the Navy to authorize the recovery of amounts erroneously paid under the plan and gives the Secretary the authority to waive recovery,[13] therefore the state cannot prosecute an act that may not be a crime under federal law; (2) it would be contrary to public policy to allow every local prosecutor in the 50 states to prosecute virtually every instance of alleged fraud against the federal government that occurred in that state.  Moore, citing *English v. General Electric Co.* (1990) 496 U.S. 72, 79 (*English*), a leading case on federal preemption,[14] states she is not asserting "the provisions for punishment for

---

[13]	Section 1453(b) of title 10 of the United States Code provides:  "Recovery of an amount erroneously paid to a person under this subchapter is not required if, in the judgment of the Secretary concerned — (1) there has been no fault by the person to whom the amount was erroneously paid; and (2) recovery of such amount would be contrary to the purposes of this subchapter or against equity and good conscience."

[14]	There are four types of federal preemption:  express, field, conflict and obstacle. (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th at 929, 935.)  Express preemption arises when Congress explicitly defines the extent to which federal legislation preempts state law.  (*English, supra*, 496 U.S. at p. 78.)  "Second, in the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.  Such an intent may be inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " (*Id*. at p. 79.)  Third, conflict preemption exists when simultaneous compliance with both state and federal law is impossible.  (*Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 713; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 815.)  Finally, obstacle preemption occurs when the challenged state law " ' "stands as an obstacle to the

proven fraud 'occupy the field'."  Moore does not explicitly discuss whether the other types of preemption apply, and her primary arguments are not supported by citation to case law.

Making a false statement or a false claim to a federal government entity is proscribed by 18 United States Code section 1001.  This provision states:  "Whoever, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Jurisdiction over violations of 18 United States Code section 1001 is conferred by 18 United States Code section 3231, which provides:  "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.  [¶]  Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."  The first sentence of 18 United States Code section 3231 "establishes two general principles:  first, federal district courts may exercise jurisdiction over federal criminal offenses, and second, state courts may not do so.  At a minimum, therefore, 18 United States Code section 3231 displaces state court jurisdiction over the direct prosecution, conviction, and

accomplishment and execution of the full purposes and objectives of Congress." ' "
(*Viva!*, at p. 936.)

51

imposition of federal criminal punishment for violations of federal criminal statutes." (*In re Jose C.* (2009) 45 Cal.4th 534, 542 (*Jose C*.).)  The second sentence of 18 United States Code section 3231 recognizes that the states are "independent sovereigns possessing inherent police power to criminally punish conduct inimical to the public welfare, even when that same conduct is also prohibited under federal law." (*Jose C*., at p. 544.)

The power to create and enforce a criminal code is one of the principal "prerogatives of sovereignty." (*Heath v. Alabama* (1985) 474 U.S. 82, 93; *People v. Drolet* (1973) 30 Cal.App.3d 207, 211 ["In the exercise of its police power, each state has the right to enact laws to promote public health, safety, morals and welfare."].)  "[I]t is settled law that the same act may constitute an offence against the United States and against a State, subjecting the guilty party to punishment under the laws of each government . . . ." (*Crossley v. California* (1898) 168 U.S. 640, 641.)  "Thus, Congress may pass a law barring a particular act and imposing a specific punishment, and a state legislature may pass a state law barring the same act and imposing a different specific punishment, as well as vesting jurisdiction over violations of the state law in its state courts, without encroaching upon the exclusive jurisdiction of the federal courts to adjudicate violations of the federal law and impose the federal punishment." (*Jose C.*, supra*, 45 Cal.4th at p. 545.)

In other words, while 18 United States Code section 3231 "grants federal courts exclusive jurisdiction over the *prosecution* of federal offenses [to the federal courts], it does not do so over the *punishment* of acts criminalized by federal law; to the extent state

law also establishes sanctions for those acts, state courts retain jurisdiction under their own state laws to hear cases and impose punishment." (*Jose C.*, *supra*, 45 Cal.4th at p. 545; *People v. Kelly* (1869) 38 Cal. 145, 150 ["The State tribunals have no power to punish crimes against the laws of the United States, *as such.* The same act may, in some instances, be an offense against the laws of both, and it is only as an offense against the State laws that it can be punished by the State, in any event."].)

The Constitution created a federal government of limited powers, while reserving a generalized police power to the states. (*U.S. v. Morrison* (2000) 529 U.S. 598, 618, fn. 8, citing *New York v. United States* (1992) 505 U.S. 144, 155-157.) In areas of traditional state regulation, the reviewing court assumes that *the historic police powers of the state are not to be superseded unless that was the clear and manifest intent of Congress.* (*Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 974.) Under our federal system, the states have the principal responsibility for defining and prosecuting crimes. (*Abbate v. United States* (1959) 359 U.S. 187, 195.) Theft has been prosecuted in California since at least 1856. (See, e.g., *People v. Taylor & McLane* (1856) 1 Cal.Unrep. 19 [theft of golddust].) The theft statutes at issue here, sections 484 and 487, were enacted in 1872 as part of the original Penal Code of California. (*People v. Salvador* (1886) 71 Cal. 15, 16-17.)

We apply a de novo standard of review to questions of law. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)

3.      *Analysis*

We reject the argument that state trial courts lack jurisdiction over the charge of theft of military benefits because Congress designated the decision whether an offense has been committed to the Secretary of the Navy (10 U.S.C. § 1453), and there is no federal statute, other than the general prohibition against making a false statement under 18 United States Code section 1001, that criminalizes the theft of military survivor benefits.

The United States Court of Appeals rejected a similar argument in *U.S. v. Roberts* (2008 7th Cir.) 534 F.3d 560.  In that case, Roberts made false statements to the Veteran's Administration (VA) to obtain disability compensation benefits, which were paid to him for several years.  When he sought additional benefits, the VA determined he did not qualify for compensation benefits and discontinued payments.  While Roberts's appeal of the VA decision was pending before the United States Court of Appeals for Veterans Claims, a federal grand jury returned an indictment charging Roberts with providing materially false information to the VA to fraudulently obtain veterans' benefits and wire fraud.  (*Id*. at pp. 566-567.)

On appeal, Roberts argued the district court should have dismissed the criminal fraud charges for lack of jurisdiction because his case was pending in the Court of Appeals for Veterans Claims.  The Court of Appeals rejected his argument, stating "[a]lthough both the criminal case in the district court and the benefits appeal before the Court of Appeals for Veterans Claims involve the question of whether Mr. Roberts made false statements in his veterans' benefits claims, the criminal prosecution is independent

54

of the administrative review process." (*U.S. v. Roberts*, *supra*, 534 F.3d at p. 568; see also *State v. Herrera* (2013) 315 P.3d 311, 316 [administrative review of forfeiture of veterans' benefits is a different matter from a criminal prosecution].) The reviewing court also stated Roberts did not cite any statutory or regulatory provision that would bar criminal prosecution until a veteran's benefits adjudication becomes final. (*U.S. v. Roberts*, *supra*, at p. 568.)

Similarly, unless additional state protections against double jeopardy apply (§ 656), a criminal case in state court is independent of a federal criminal prosecution. (*People v. Homick* (2012) 55 Cal.4th 816, 839-840; *People v. Belcher* (1974) 11 Cal.3d 91, 96-97 [the Constitution does not bar prosecution and conviction for the same act by both the state and federal governments].) As in *U.S. v. Roberts*, *supra*, 534 F.3d 560, Moore does not cite any statutory, regulatory or case law that would bar a criminal prosecution, whether state or federal, in favor of the administrative review process. (Cf. *id.* at p. 568.)

Moore also argues theft of military benefits cannot be prosecuted in state court because then "virtually every instance of alleged fraud against the United States would be a State crime." This is a public policy argument for the Legislature. Unless the statute in question has been preempted by Congress or dual federal and state prosecution is barred by a state's enhanced protection against double jeopardy, fraud in obtaining federal benefits may be subject to criminal prosecution under state law proscribing such conduct. (See, e.g., *State v. Herrera*, *supra*, 315 P.3d at pp. 317-318 [state court has jurisdiction over fraud prosecution of two defendants for allegedly fraudulently obtaining funds from

the VA]; *State v. Wallace* (2005) 828 N.E.2d 125, 129-130 [prosecution of defendant under Ohio theft statute for committing theft against the Social Security Administration is not preempted by federal law]; *Commonwealth v. Morris* (1990) 575 A.2d 582, 583 [federal law imposing a penalty for improperly obtaining Social Security benefits does not preempt state criminal prosecution for theft by deception based on same conduct]; *People v. Lewis* (1998) 693 N.E.2d 916, 920 [state court has jurisdiction to prosecute theft of fraudulent unemployment benefits from the United States Railroad Retirement Board]; see also *State v. Ochoa-Lara* (2015) 362 P.3d 606, 610-612 [prosecution of defendant under Kansas identity theft statute for falsely using another person's Social Security card is not preempted by federal law].)

Finally, we address Moore's contention that her conviction for theft of military survivor benefits must be reversed because the federal government is not a "person" under section 7 and therefore cannot be the victim of the crime of theft. In making her argument, Moore relies on the plain meaning of the term "person," and does not cite any case law in support of her interpretation. However, under California case law, the term "person" includes a governmental entity.

In *People v. Diamondstein* (1919) 42 Cal.App. 490, 491, the term "person" was expressly construed to include a county. The *Diamondstein* court stated, "While the political subdivision of the state denominated a 'county' is not in strictness a corporation, at the same time it requires no stretching of the plain intent of the criminal statute to say that [the theft statute] was designed to make punishable the stealing of personal properly from any ownership whatsoever." (*Ibid.*; see also *People v. Shirley* (1961) 55 Cal.2d 521,

56

523-524 [upholding grand theft conviction from a county], *People v. Strub* (1975) 49

Cal.App.3d Supp. 1, 3 [county is a "person" for purposes of criminal prosecution for

welfare fraud], *People v. Dale* (1966) 239 Cal.App.2d 634, 639 [state agency can be the

victim of theft]; cf. *People v. Crow* (1993) 6 Cal.4th 952, 957-958 [defrauded county

agency was a victim within the meaning of the restitution statutes].)  Moore does not cite

any authority, and we have not located any in our independent research, to support her

argument that a federal governmental agency is not a "person" within the meaning of

section 7 and therefore cannot be the victim of theft.

E.     *The Markovich Counts*

Moore contends her convictions for financial elder abuse and grand theft from

Dr. Markovich should be set aside because the trial court violated her constitutional right

to confront the witnesses against her.  In addition, Moore contends the People's theory of

theft by false pretenses was inapplicable as a matter of law, and the conviction for

financial elder abuse should be reversed because section 368, subdivision (d) does not

constitute a separate offense, but instead imposes additional penalties on a person who

has violated any provision of the law proscribing theft, embezzlement, forgery or fraud

when the victim is an elder.

1.     *Moore Has Forfeited the Claim She Should Have Been Charged with Larceny by Trick, Not Theft by False Pretenses*

Moore contends because Dr. Markovich loaned her the funds at issue, the proper

charge was larceny by trick, not theft by false pretenses.  The record shows that, at the

end of the trial, the People announced it was not pursuing a conviction for theft based on

57

the theory of larceny by trick. In response, the defense said it had no "issues" with that. Accordingly, the trial court did not instruct the jury on the theory of larceny by trick. We conclude that the issue has been forfeited on appeal by Moore's failure to object at trial. (*Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221-222.)

2.      *Financial Elder Abuse Statute Grand Theft Is a Lesser Included Offense to Grand Theft*

Moore contends section 368 is a sentencing enhancement that applies when specified crimes are committed against an elder, and requests this court strike her conviction for financial elder abuse (count 7). The People concede error on other grounds. They assert grand theft is a lesser included offense of financial elder abuse, and ask this court to strike Moore's conviction for grand theft (count 8). The People acknowledge Moore's convictions for financial elder abuse and grand theft were based on the same conduct.

At issue is whether section 368, subdivision (d) operates as a separate offense or as a sentencing enhancement. It appears to be a question of first impression. Reviewing courts have assumed section 368, subdivision (d) [theft from an elder] is a separate offense. (See, e.g., *People v. Eastburn* (2010) 189 Cal.App.4th 1501 [upholding conviction for financial elder abuse by forgery]; *Brock*, *supra*, 143 Cal.App.4th at pp. 1282-1283 [overturning conviction for theft against an elder on instructional grounds]. Moore relies on *People v. Adams* (2001) 93 Cal.App.4th 1192 for the proposition that section 368, subdivision (b) is a sentencing enhancement and not a substantive crime. However, *Adams* interprets section 368, subdivision (b)(3)(A), which

58

sets forth the sentencing structure for a defendant who has committed "*an offense described in [section 368, subdivision (b)(1)].*" (*Adams*, at p. 1198, italics added.)

As relevant here, section 368, subdivision (d) provides: "Any person who is not a caretaker who violates *any provision of law proscribing theft*, embezzlement, forgery, or fraud . . . with respect to the property or personal identifying information of an elder or a dependent adult, and who knows or reasonably should know that the victim is an elder or a dependent adult, is punishable [as set forth]." (Italics added.) Section 368, subdivision (d)(1) describes the penalties that apply when the value of property exceeds $950; subdivision (d)(2) applies when the value of the property taken does not exceed $950. Thus, section 368, subdivision (d)(1) "provides for an increased penalty when the victim is a member of the protected class. When, as in this case, the defendant is convicted of stealing more than [$950] from an elder adult, the normal penalty for grand theft is increased by one year." (*Brock*, *supra*, 143 Cal.App.4th at pp. 1281-1282.)

In construing a statute, our principal task is to ascertain the intent of the Legislature. We do so by first turning to the words themselves, giving them their ordinary meaning. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621.) The statutory language is construed in the context of the statute as a whole and the overall statutory scheme. Reviewing courts give significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. (*People v. Canty* (2004) 32 Cal.4th 1266, 1276-1277.) In determining intent, we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we simply apply the words as written. (*Gardeley*, at p. 621.) "[W]e consider portions of a statute in

59

the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063.)

Viewed in isolation, it is not clear whether the Legislature intended section 368, subdivision (d) to apply as a sentencing enhancement when a defendant is convicted of theft, embezzlement, forgery or fraud against an elder adult, or whether the Legislature intended to describe a substantive offense. However, section 368, subdivision (*l*), states "[u]pon *conviction* for a violation of subdivision (b), (c), (d), (e), or (f), the court shall also consider issuing an order restraining the defendant from any contact with the victim . . . ." (Italics added.) Thus, considering the statute of which it is a part, we conclude that section 368, subdivision (d) constitutes a substantive offense.

The People correctly observe that "[i]f the statutory elements of one offense include all of the statutory elements of another offense, a defendant cannot be convicted of both offenses for the same conduct." (Citing *Reed*, *supra*, 38 Cal.4th at p. 1229.) Section 368, subdivision (d) incorporates the crime of theft, thus including all of its elements in the offense of financial elder abuse. Therefore, we accept the People's concession and strike Moore's conviction for grand theft against Dr. Markovich.

3. *Right of Confrontation*

Moore contends the admission of Dr. Markovich's and Cdr. Markovich's conditional examinations (Markovich examinations) violated her confrontation rights under the Sixth Amendment to the United States Constitution. She argues California law permits the use of conditional examinations in lieu of in-court testimony only in limited

60

circumstances, and the People did not meet its burden to exercise good faith and due diligence to secure the witnesses' attendance at trial. Thus, Moore contends, there was an inadequate showing that the witnesses were unavailable to testify at trial. Moore asserts the trial court did not consider the importance of the witnesses' testimony. She further contends she was unable to effectively cross-examine the witnesses at the time of their conditional examinations because discovery was not complete, and she could not impeach Dr. Markovich's testimony with Cdr. Markovich's contradictory statements.

The People respond Dr. Markovich and Cdr. Markovich were unavailable for trial as a matter of law under Evidence Code section 240, subdivisions (a)(3) [physical or mental illness or infirmity] and (a)(5) [despite reasonable diligence, proponent of witness's statement is unable to procure witness's attendance by court process]. The People state Dr. Markovich was an elderly woman suffering from acute and chronic medical conditions and Cdr. Markovich was on active duty in Bahrain. In addition, Moore had a constitutionally sufficient opportunity to cross-examine the witnesses during their conditional examinations.

a.      *Additional Factual and Procedural Background*

Dr. Markovich's conditional examination occurred on June 1, 2012.[15] Defense counsel objected to the examination on the ground he did not have appropriate pretrial

---

[15]     "[T]he prosecution may apply for a court order compelling a material witness to submit to a conditional examination if the witness 'is about to leave the state, or is so sick or infirm as to afford reasonable grounds for apprehension that he or she will be unable to attend the trial, or is a person 65 years of age or older, or a dependent adult' (§ 1336, subd. (a))." (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1519, italics omitted.)

61

discovery. He pointed out that Moore's computers had been seized by the police, and had years' worth of e-mail and other records that could be helpful to the defense.

The trial court said, "We're at a point now where we're going to do the exam. The idea is she is going to be around. We're just hedging our bets, right?" The trial court stated it was proceeding with the conditional examination out of an abundance of caution and, if a relevant issue arose during discovery, the defense could bring it to the court's attention. The examination was recorded on video.

Dr. Markovich testified she had a history of high blood pressure, an enlarged heart, hypertensive cardiovascular disease, severe spinal stenosis in three discs, diabetes, hypothyroidism, anemia, constant chest pain and shortness of breath. She had had a five-vessel heart bypass operation in 1999 and was prescribed a variety of medications. After the conditional examination, the trial court said he was reluctant to order the transcript of Dr. Markovich's conditional examination at court expense, saying, "I think she is going to be fine. She looked in good health."

Cdr. Markovich's conditional examination took place on June 24, 2013. He said he was transitioning "right now" to Commander United States Naval Forces Central Command in Bahrain, where he would be deployed for 12 months. As a result, he would not be available to testify at trial, which at that time was scheduled to begin in November 2013. The trial did not start until June 2014.

On May 27 and 28, 2014, the trial court heard pretrial motions, including the People's motion to admit the Markovich examinations or to allow Dr. Markovich to testify by videoconference. Moore opposed the admission of the conditional

62

examinations or videoconference on the ground that the prosecution had not exercised due diligence to produce the witnesses at trial.

In its moving papers the People stated, "Dr. Markovich is 80 years old and in failing health. She is unable to travel." With respect to Cdr. Markovich the People stated, "The witness is active duty military and unable to leave his command during the time set for trial." A letter jointly signed by Cdr. Markovich and Captain E. B. Cashman was attached to the motion:

> "Commander Bobby Markovich, United States Navy, is assigned to Commander U.S. Naval Forces Central Command (COMUSNAVCENT) located in the Kingdom of Bahrain where he serves as the Deputy Future Operations Director.

> "Due to his deployed status and the operational tempo of COMUSNAVCENT, [Cdr.] Markovich is unavailable to participate as a live witness for Tara Moore's trial in June. He is critical to the execution of COMUSNAVCENT operations and his absence would cause an operational gap.

> "Additionally, due to the nature of [Cdr.] Markovich's work, and the time difference between San Diego and Bahrain, it is not feasible for him to participate in video teleconferencing or telephone testimony for any extended period of time.

> "I understand [Cdr.] Markovich provided extensive video testimony in advance of his deployment in anticipation of his unavailability. I respectfully suggest that you consider use of the video testimony in lieu of live testimony due to [Cdr.] Markovich's operational commitment."

The defense argued the letter, particularly its statement that there would be an "operational gap" if Cdr. Markovich left his command to testify, was insufficient to satisfy the requirement of unavailability.

The trial court said if "the admiral" wanted a witness pulled off the carrier, the witness would be on the next plane. If "the admiral" did not, the witness would not be produced. The trial court said it was very difficult to determine military need. With respect to Dr. Markovich, the trial court advised the prosecution, "You didn't attach anything regarding her health. She looked pretty darn good two years ago."

The next day, the prosecution submitted a letter, dated May 21, 2014, from Mark D. Haugen, M.D., stating:

> "My name is Dr. Mark Haugen and I have been taking care of Dragica Markovich since March 6, 2013. The patient has been recently asked to travel to San Diego for a court case. The patient has multiple medical problems including coronary artery disease, hypertensive disease with congestive heart failure, lumbar canal stenosis status post-surgery a little over a year ago, sleep apnea, type two diabetes with complications with vascular disease. She has a history of coronary bypass grafting surgery. The patient also has depression with anxiety which makes her health conditions worse. I feel it would not be advisable for my patient to travel to San Diego for a very stressful legal situation. She two years ago when traveling to San Diego had to take nitroglycerin five times due to angina. Since then she still has blood pressures difficult to control and I think the additional stress will make this worse. Also, the stress will make her diabetes worse and putting her out of her routine will make her sleep apnea worse. All of these stresses would put her at risk for heart disease or a heart event. In addition she recently flared her back so traveling would probably throw out her back which was just repaired with surgery. Therefore, I would not advise her to fly for a deposition or any kind of court case."

Defense counsel acknowledged reviewing the letter.[16] The trial court turned its attention to other motions. Later, in ruling on the various motions, the trial court said the

16     The parties argue whether the letter from Dr. Markovich's doctor, Mark Haugen, M.D., was lodged in the record or marked as an exhibit. The People asked the Clerk of the Superior Court to transmit it to this court as an exhibit. It was not included

People met its burden to show that Dr. Markovich was unavailable, stating "there is not a judge in this country that would force her to come down and testify."  The trial court found that Cdr. Markovich was on active duty and was therefore "by law and by definition, unavailable."  The court granted the People's motions to admit the Markovich examinations in evidence.

Opening arguments in the trial were presented on June 12, 2014, the conditional examinations were played for the jury on June 16 and 17, the last witness testified on July 22,[17] and closing argument in the trial concluded on July 28.

### b. *Legal Principles and Standard of Review*

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  The United States Supreme Court has held that "this bedrock procedural guarantee applies to both federal and state prosecutions."  (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*); *People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*) [the confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the

---

in the exhibits transmitted to this court.  This court made repeated inquires to the Clerk of the Superior Court, who was unable to locate this document.  The parties have made no effort to augment, correct or settle the record on appeal.  (See *Marks v. Superior Court* (2002) 27 Cal.4th 176, 192-194 [setting forth procedures to fill in "gaps" in the record]; rule 8.137.)

We obtained a copy of the Haugen letter from the Attorney General's office, which was filed with the Superior Court on May 28, 2014.  On our own motion, we ordered the record on appeal augmented with the Haugen letter.  (Rule 8.155(a)(1)(A).)

[17]    The parties agreed to allow the defense to present witnesses out of order.  As a result, the prosecution reopened its case-in-chief on July 22.

prosecution's witnesses].)  The right to confrontation is basically a trial right.  It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness.  (*Barber v. Page* (1968) 390 U.S. 719, 725 (*Barber*).)

The right of the accused to confront the witnesses against her is not absolute.  An exception exists when a witness is unavailable and has given testimony subject to cross-examination at a previous court proceeding against the same defendant.  (*Cromer*, *supra*, 24 Cal.4th. 889.)  California has codified this exception in section 1291, subdivision (a)(2) of the Evidence Code.  This provision states that "[e]vidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, and" "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."  (*Ibid*.)

As relevant here, "unavailable as a witness" means the declarant is:  unable to testify at the hearing "because of then-existing physical illness or infirmity"; "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process"; or "absent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure the declarant's attendance by the court's process."  (§ 240, subd. (a)(3), (4), (5).)  "[W]hen the requirements of [Evidence Code] section 1291 are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation."  (*People v. Herrera* (2010) 49

66

Cal.4th 613, 621, citing *People v. Friend* (2009) 47 Cal.4th 1, 67; see *Barber*, *supra*, 390 U.S. at pp. 724-725.)

"A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*People v. Herrera*, *supra*, 49 Cal.4th at p. 622.) The prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances. (*Id.* at pp. 622-623.) However, " '[t]he law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation.' " (*Id.* at p. 622, quoting *Ohio v. Roberts* (1980) 448 U.S. 56, 74, disapproved on another point in *Crawford*, *supra*, 541 U.S. at pp. 60-68.)

In determining whether the prosecution's efforts to secure the presence of a witness meet the constitutional standard of reasonableness, some factors are more important than others. "First, the more crucial the witness, the greater the effort required to secure his attendance." (*Cook v. McKune* (10th Cir. 2003) 323 F.3d 825, 835 (*Cook*); accord, *People v. Herrera*, *supra*, 49 Cal.4th at pp. 622-623 [circumstances include the importance of the witness's testimony]; see generally, *United States v. Foster* (D.C. Cir. 1993) 986 F.2d 541, 543 ["The more important the witness to the government's case, the more important the defendant's right, derived from the confrontation clause of the Sixth Amendment, to cross-examine the witness."].) "Second, the more serious the crime for

67

which the defendant is being tried, the greater the effort the government should put forth to produce the witness at trial." (*Cook*, at p. 835.) "Third, where a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger." (*Cook*, at p. 836.) "Fourth, a good measure of reasonableness is to require the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available." (*Ibid.*)

Other factors bear on whether a witness is unavailable. Where the absence of the witness results from illness, a court should also consider the nature of the illness and the probable duration of the illness. (*United States v. Faison* (3d Cir. 1982) 679 F.2d 292, 297.) Securing the presence of a military witness turns on "the effect that a military witness's absence will have on his or her unit and whether that absence will adversely affect the accomplishment of an important military mission or cause manifest injury to the service." (*U.S. v. Jones* (N-M. C.M.R. 1985) 20 M.J. 919, 926.)

"We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard . . . , and independently review whether the facts demonstrate prosecutorial good faith and due diligence . . . ." (*People v. Herrera*, *supra*, 49 Cal.4th at p. 623, citations omitted.)

        c.       *We Reject the Prosecution's Argument Cdr. Markovich and*
                      *Dr. Markovich Were Unavailable as a Matter of Law*

The People contend Cdr. Markovich and Dr. Markovich (the witnesses) were unavailable as a matter of law because Cdr. Markovich was on active duty in Bahrain and

68

Dr. Markovich was an elderly woman suffering from acute and chronic medical conditions. In making this argument, the People disregard the constitutional preference for in-court testimony. Thus, "[a] witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*People v. Herrera*, *supra*, 49 Cal.4th at p. 622, citing *Barber*, *supra*, 390 U.S. at pp. 724-725.)

In *People v. Herrera*, *supra*, 49 Cal.4th 613, the California Supreme Court noted that Evidence Code section 240, subdivision (a)(5)'s requirement of "reasonable diligence" was the equivalent of a " 'good faith effort.' " (*People v. Herrera*, *supra*, at p. 622.) Further, even though the term "reasonable diligence" was missing from Evidence Code section 240, subdivision (a)(4), the *Herrera* court held that "unavailability in the constitutional sense nonetheless requires a determination that the prosecution satisfied its obligation of good faith in attempting to obtain [the witness's] presence." (*People v. Herrera*, *supra*, at p. 623.) Thus, the determination of unavailability must include an assessment of whether the prosecution made a good faith effort to secure a witness's presence at trial.

The trial court found that the People met its burden to show that Dr. Markovich was unavailable, and that Cdr. Markovich was "by law and by definition, unavailable." The record does not indicate the trial court considered whether the prosecution made a good faith effort to secure the presence of Cdr. Markovich and Dr. Markovich. There is no indication the trial court assessed the importance of the witnesses' testimony, the seriousness of the crime, whether the witnesses had special reason to favor the

69

prosecution, or whether the prosecution had made the same sort of effort to locate and secure the witness for trial it would have made if it did not have the prior testimony available.  (*Cook*, *supra*, 323 F.3d at pp. 835-836.)

This record clearly shows that Cdr. Markovich's and Dr. Markovich's testimony was crucial to the prosecution.  There were no other witnesses to the conversations between Moore and the Markoviches.  The prosecution intended to base its case on Dr. Markovich's and Cdr. Markovich's testimony.  Other evidence merely tended to corroborate the Markoviches' testimony.  Moore was sentenced to seven years on the Markovich counts.  Dr. Markovich was a complaining witness who would benefit from an order of restitution, as would Cdr. Markovich as her heir.[18]  Other than making contact with the witnesses, the record does not reflect what efforts, if any, the prosecution made to secure their presence at trial.  With these observations, we turn our discussion to whether the trial court erred when it determined Cdr. Markovich and Dr. Markovich were unavailable.

    d.    *There Is Substantial Evidence to Support a Finding That Dr. Markovich Was Unavailable to Testify*

We reject Appellant's contention that there is no evidence to show the nature and probable duration of Dr. Markovich's medical condition because the Haugen letter was not marked as an exhibit or lodged with the court.  The burden is on the appellant to produce a complete record for review.  Failure to provide an adequate record for review

---

18    The trial court ordered restitution in the amount of $2,339,000, payable to Dr. Markovich or, in the event of her death, to Cdr. Markovich or his sister.

results in forfeiture of the issue on appeal (*People v. Dominguez* (1981) 121 Cal.App.3d 481, 503), not, as appellant contends, a lack of substantial evidence to support the ruling. To avoid a claim of ineffective assistance of appellate counsel, on our own motion, we augmented the record with the Haugen letter.  (See fn. 20, *ante*.)

The Haugen letter permits a reasonable inference that the prosecution asked Dr. Markovich to travel from Washington State to San Diego to testify at trial. Dr. Markovich had multiple medical problems including coronary artery disease, hypertensive disease with congestive heart failure, a fairly recent back surgery, sleep apnea, type 2 diabetes with complications with vascular disease, and other medical problems.  Dr. Haugen advised against Dr. Markovich traveling to San Diego to testify at trial, stating the stress would put her at risk for heart disease or a heart event.  Thus, there is substantial evidence to support the trial court's finding Dr. Markovich was unavailable to testify at trial because of physical illness.  (Evid. Code, § 240, subd. (a)(3) [witness is unable to attend or to testify at the hearing because of then-existing physical illness or infirmity].)  On appeal, Moore questions the validity of the doctor's conclusions for the first time, and has thus forfeited the argument.

Moore argues she did not have a meaningful opportunity to cross-examine Dr. Markovich because her conditional examination occurred prior to any discovery in the case, and therefore the trial court erred when it admitted Dr. Markovich's conditional examination in evidence.  As an example, Moore contends she did not have the opportunity to impeach Dr. Markovich with Cdr. Markovich's statements contradicting her testimony.  Moore contends the trial court could have ensured she had an adequate

71

opportunity for effective cross-examination by ordering a new conditional examination to take place in Washington State.

Moore has forfeited the argument there were alternatives to in-person testimony that would have protected her right of confrontation. The People asked the trial court to admit Dr. Markovich's conditional examination in evidence or, alternatively, to allow her to testify by videoconference. The defense opposed allowing Dr. Markovich to testify by videoconference, and did not propose any alternatives to the admission of the conditional examination in its opposition papers or at the hearing on the motion. Moore cannot now complain the trial court erred by not pursuing alternatives to admitting Dr. Markovich's conditional examination into evidence to protect Moore's confrontation rights.

Further, at the time of the conditional examination, which defense counsel opposed on the ground of inadequate discovery, the trial court said if a relevant issue arose during discovery, the defense could bring the issue to the court's attention. Moore did not identify any issue requiring further cross-examination of Dr. Markovich. Thus, Moore does not meet her burden to show she was denied a meaningful opportunity to cross-examine Dr. Markovich.

We conclude the trial court did not err when it determined Dr. Markovich was unavailable to testify at trial and admitted her conditional examination into evidence.

e.     *There Is Insufficient Evidence to Show That Cdr. Markovich Was Unavailable*

The trial court concluded that securing Cdr. Markovich's presence was entirely within the discretion of "the admiral," and observed it was difficult to determine military

72

need. As we discussed, the record does not indicate the trial court assessed the importance of Cdr. Markovich's testimony or considered whether the prosecution had made a good faith effort to secure his presence at trial.

In criminal trials, " 'unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through *its own process*, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. [Citation.] Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met.' " (*People v. Foy* (2016) 245 Cal.App.4th 328, 346 (*Foy*), quoting *People v. Herrera*, *supra*, 49 Cal.4th at pp. 626-628; *Barber*, *supra*, 390 U.S. at pp. 723-725 [mere absence of witness from the jurisdiction is not a sufficient ground for introducing prior testimony because it is often possible to procure the presence of out-of-state witnesses under modern procedures].)

The record contains no evidence to show the prosecution contacted "the admiral" or identified a member of the military command with the authority to grant a request for leave in response to a subpoena to testify at trial. There is nothing in the record to indicate whether Captain Cashman had the authority to respond to a request for Cdr. Markovich to appear at trial. The trial court correctly noted it was difficult to determine military need. However, the trial court need not make that decision. Rather, the determination of military need is made by the appropriate military command upon a

73

request by the prosecutor to compel the presence of a witness who is serving in the military. Here, the stated reason for military necessity — that Cdr. Markovich's absence would cause an "operational gap" — does not appear to meet the standard for compelling the presence of a military witness, which is "the effect that a military witness's absence will have on his or her unit and whether that absence will adversely affect the accomplishment of an important military mission or cause manifest injury to the service." (*U.S. v. Jones*, *supra*, 20 M.J. at p. 926.) Thus, the record does not show that an attempt to secure Cdr. Markovich's presence would have been futile under the prevailing standard for military necessity. (*Ohio v. Roberts*, *supra*, 448 U.S. at p. 74 ["if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation"].)

Further, there is insufficient evidence to support a finding that Cdr. Markovich's deployment in Bahrain would prevent him from being physically present at trial. At his conditional examination, which was taken on June 24, 2013, Cdr. Markovich said he was transitioning "right now" to Bahrain on a 12-month deployment. The record permits the reasonable inference that at the time of the hearing on the motion to admit the conditional examination, Cdr. Markovich's 12-month deployment was due to end in four to six weeks. His letter, dated May 21, 2014, states he was "unavailable to participate as a live witness for Tara Moore's trial in *June*." (Italics added.) There is no indication the prosecution tried to ascertain when Cdr. Markovich's deployment would end and whether he would be available to testify at the trial in July. Jury selection was not scheduled to start until the first week of June. The trial court recognized that the Berkley/Anderson

allegations would consume the most time. The prosecution in fact was presenting evidence at trial in the third week in July.

Moore has a "bedrock procedural guarantee" to confront the witnesses against her at trial. (*Crawford*, *supra*, 541 U.S. at p. 42.) In view of the importance of Cdr. Markovich's testimony and his interest in the outcome of the trial, the lack of evidence indicating the prosecution contacted the appropriate military command with a request to allow Cdr. Markovich to testify at trial, and the evidence showing his deployment was scheduled to end within a short time, we conclude that the trial court erred in admitting in evidence Cdr. Markovich's conditional examination.

> f.    *The Error in Admitting Cdr. Markovich's Conditional Examination into Evidence Is Harmless Beyond a Reasonable Doubt*

Without citation to authority, Moore asserts a confrontation clause error merits reversal per se. The People contend the conditional examinations were properly admitted into evidence, and do not address whether any error was prejudicial. We ordered the parties to submit additional briefing on the issue.

In supplemental briefing, Moore argues the People cannot carry its burden to show that the constitutional error was harmless beyond a reasonable doubt. She contends section 532, subdivision (b) provides "the defendant cannot be convicted [of grand theft by false pretenses] . . . unless the pretense is proven by the testimony of two witnesses, or that of one witness and corroborating circumstances." Moore maintains all the alleged misrepresentations were made during telephone conversations between herself,

75

Dr. Markovich and Cdr. Markovich, and without Cdr. Markovich's testimony, there is no corroborating evidence to support a conviction of grand theft by false pretenses.

The People contend Cdr. Markovich's testimony contributed little to the proof of Moore's theft from Dr. Markovich, and was not essential to prove Moore's guilt in view of the other credible evidence against her. In addition to Dr. Markovich's testimony and the financial documents corroborating her account of the events, Berkley and Anderson testified Moore never had an interest in the RB property, and the forensic analysis confirmed that none of Dr. Markovich's money was used for the RB Project.

Under *Chapman v. California* (1967) 386 U.S. 18, 24, the beneficiary of a federal constitutional error must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict. An error that did not contribute to the ensuing verdict is an error that is " ' "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463 (*Pearson*).) Thus, reversal is required unless the record shows beyond a reasonable doubt that Moore was not prejudiced by the erroneous admission in evidence of Cdr. Markovich's conditional examination. (*Ibid.*)

"To determine whether a confrontation clause violation is harmless beyond a reasonable doubt, courts consider 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength

of the prosecution's case.' " (*Foy*, *supra*, 245 Cal.App.4th at p. 351, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

" 'A theft conviction on the theory of false pretenses requires proof that (1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' " (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1440.) If the conviction rests primarily on a single witness testifying the false pretense was made, the making of the pretense must be corroborated. (*Id*. at p. 1441.)

We reject Moore's argument the testimony of a second witness is required to corroborate the making of the pretense. Instead, "[t]he circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons may be looked to for the corroborative evidence contemplated by the law." (*People v. Randono* (1973) 32 Cal.App.3d 164, 173.) Because "the corroborative evidence need only tend to implicate the defendant in the alleged illegal activity, it may be slight and entitled to little weight standing alone." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 470.)

On this record, we conclude that there was ample corroborating evidence of the making of the pretense and that the erroneous admission of Cdr. Markovich's conditional examination was harmless beyond a reasonable doubt. Dr. Markovich took contemporaneous notes during her conversations with Moore and Cdr. Markovich about the RB Project. In her testimony, Dr. Markovich detailed the dates the defendant asked

77

her for money for the RB Project and the reasons she needed the funds. Those reasons included needing money for permits, a fire analysis, a traffic safety study, a public safety study, and to secure the site after a landslide. There is no evidence contradicting Dr. Markovich's testimony on key points. Cdr. Markovich's testimony duplicated his mother's testimony about Moore's requests for money for the RB Project.

Berkley's testimony corroborates Dr. Markovich's testimony that Moore made false statements to her about the RB Project. Berkley testified Moore repeatedly approached him to invest in the development of the RB property. She told him Anderson had agreed to sell the property to her at an attractive price. Moore told Berkley she hired an architect to do a preliminary study and may have a prospective tenant. She advised Berkley about a soils report, and sent a rendering of a proposed building to him. Anderson testified he still owned the RB property. He was not involved in developing it with anyone. Anderson never discussed selling the property to Moore.

The evidence showing the RB Project did not exist is uncontroverted. Dr. Markovich's testimony about the amount of Moore's requests, and the date on which they occurred, is corroborated by documentary evidence showing the transfer of funds from Dr. Markovich's brokerage account to Moore's bank account. Expert forensic accounting testimony demonstrated that Moore primarily used Dr. Markovich's funds for her personal expenses, and did not make any expenditures on the RB Project. Berkley testified that Moore sought his investment in the RB Project, which he later learned did not exist. Moore's conduct with Berkley is sufficient to corroborate Moore's intent to defraud. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 [recurrence of similar acts tend to

negate claim of innocent mental state, and tends to establish the presence of the criminal intent accompanying such an act].)  Thus, the erroneous admission of Cdr. Markovich's conditional examination was " ' "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." ' "  (*Pearson*, *supra*, 56 Cal.4th at p. 463.)  We conclude that the constitutional error is harmless beyond a reasonable doubt.  (*Foy*, *supra*, 245 Cal.App.4th at pp. 350-351.)

F.    *Forgery*

Moore contends her conviction for forgery must be reversed because falsification of a brokerage account statement does not constitute forgery and there is not substantial evidence to support the conviction.

1.    *Additional Factual and Procedural Background*

Moore presented the first page of an altered Morgan Stanley account statement to Berkley to show she had sufficient means to purchase Jack's.  Berkley asked Moore to explain her ownership interest in the account.  Moore said Dr. Markovich and Cdr. Markovich were "dear friends," and she had unilateral access to funds in the account.

The original brokerage account statement listed "DRAGICA MARKOVICH TOD MIRYANA GREGG" on one line, "BOGOLJUB MARKOVICH JR" on the next line, and "SUBJ TO STA RULES" on the third line.  The statement was "FOR MONTH ENDING SEPTEMBER 30, 2006."

The altered brokerage account statement listed "DRAGICA MARKOVICH" on the first line, "BOGOLJUB MARKOVICH JR" on the second line, and "TARA

79

MOORE" on the third line.  The statement was "FOR MONTH ENDING MAY 31, 2009."

2.  *Legal Principles and Standard of Review*

Section 470 states, in pertinent part that every person who, with the intent to defraud — (a) knowing that he or she has no authority to do so, signs the name of another person or of a fictitious person to any of the items listed in section 470, subdivision (d);[19] (b) counterfeits or forges the seal or handwriting of another; (c) alters, corrupts, or falsifies any record of any will, codicil, conveyance, or other instrument, the record of which is by law evidence, or any record of any judgment of a court or the return of any officer to any process of any court; (d) falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine,

---

[19]  The items listed in section 470, subdivision (d) are:  "any check, bond, bank bill, or note, cashier's check, traveler's check, money order, post note, draft, any controller's warrant for the payment of money at the treasury, county order or warrant, or request for the payment of money, receipt for money or goods, bill of exchange, promissory note, order, or any assignment of any bond, writing obligatory, or other contract for money or other property, contract, due bill for payment of money or property, receipt for money or property, passage ticket, lottery ticket or share purporting to be issued under the California State Lottery Act of 1984, trading stamp, power of attorney, certificate of ownership or other document evidencing ownership of a vehicle or undocumented vessel, or any certificate of any share, right, or interest in the stock of any corporation or association, or the delivery of goods or chattels of any kind, or for the delivery of any instrument of writing, or acquittance, release or discharge of any debt, account, suit, action, demand, or any other thing, real or personal, or any transfer or assurance of money, certificate of shares of stock, goods, chattels, or other property whatever, or any letter of attorney, or other power to receive money, or to receive or transfer certificates of shares of stock or annuities, or to let, lease, dispose of, alien, or convey any goods, chattels, lands, or tenements, or other estate, real or personal, or falsifies the acknowledgment of any notary public, or any notary public who issues an acknowledgment knowing it to be false; or any matter described in subdivision (b)."

any of the items listed in section 470, subdivision (d), knowing the same to be false, altered, forged, or counterfeited — is guilty of forgery.

A conviction of forgery requires the person utter, publish or pass the forged document, knowing the document is false, with the specific intent to defraud another person. (§ 470, subd. (d); see CALJIC No. 15.01.) "An intent to defraud is an intent to deceive another person for the purpose of gaining a material advantage over that person or to induce that person to part with property or alter that person's position by some false statement or false representation of fact, wrongful concealment or suppression of the truth or by any artifice or act designed to deceive." (*People v. Pugh* (2002) 104 Cal.App.4th 66, 72; see *Lewis v. Superior Court* (1990) 217 Cal.App.3d 379, 385-387 [discussing common law background and history of forgery statute].) " ' "Forgery, at common law, is the false making or material altering, with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of a legal liability." ' [Citation.] That is evident in section 470 by the detailed attention which is shown in the listing of instruments which may be made the subjects of forgery." (*Lewis v. Superior Court*, *supra*, at p. 387.)

The issue of whether a brokerage account statement comes within the meaning of a forgeable instrument is a question of law. Our review is de novo. (*In re T.B.* (2009) 172 Cal.App.4th 125, 129 [the meaning of a statute is a question of law that is subject to de novo review].)

81

3. *Analysis*

Section 470 has four subdivisions. Subdivision (a) pertains to the act of signing the name of another or fictitious person to an item listed in subdivision (b). Subdivision (a) does not apply here because Moore was not alleged to have signed the name of another person or a fictitious person to the brokerage account statement. Subdivision (b) does not apply because Moore was not alleged to have counterfeited or forged the seal or handwriting of another person. Similarly, subdivision (c) does not apply because Moore was not alleged to have altered any of the specific instruments listed in that subdivision. Finally, although subdivision (d) describes Moore's conduct in falsely altering a document and attempting to pass it as true and genuine, a brokerage account statement is not among the items listed in subdivision (d). However, the statutory listing in section 470, subdivision (d) is not exclusive. (*People v. Gaul-Alexander* (1995) 32 Cal.App.4th 735, 742 (*Gaul-Alexander*).)

The People argue the altered brokerage account statement comes within section 470 because Moore used the account statement to show her ownership interest in those funds and to deceive Berkley into agreeing to a financial transaction. The People claim the brokerage account statement comes within the meaning of section 470 because it is an instrument that "if genuine, would create some legal right or obligation" and presenting it to another person would "have the effect of defrauding one who acts upon it as genuine." (*Gaul-Alexander*, *supra*, 32 Cal.App.4th at pp. 741, 742.)

We are not persuaded by the People's argument. "Making virtually any kind of false document affords an inference that the maker intends to deceive someone.

82

However, only a document with apparent legal efficacy is naturally suited to perpetrate the kind of deception that is strictly speaking a defrauding." (*Lewis v. Superior Court*, *supra*, 217 Cal.App.3d at p. 388.) An instrument is defined as a " 'written paper or instrument signed and delivered by one person to another transferring the title to or creating a lien on property, or giving a right to a debt or duty.' " (*People v. Tate* (1997) 55 Cal.App.4th 663, 666, quoting *Hoag v. Howard* (1880) 55 Cal. 564, 565.) In contrast, a brokerage account statement does not create some legal right or obligation as would, for example, a check drawn on the brokerage account, a promissory note, or a certificate of shares. A forged document that was intended to influence the judgment of another person, but does not create some apparent legal right or obligation, cannot have the effect of defrauding that person within the meaning of the forgery statute. (*People v. Lewis*, *supra*, at p. 388.)

Our conclusion that a brokerage account statement does not come within the meaning of section 470 is supported by the well-settled rule that a general statutory provision is controlled by a special, more specific statutory provision. (*People v. Superior Court (Jimenez)* (2002) 28 Cal.4th 798, 808.) In section 523a, the Legislature criminalized the making of written false statements concerning a person's financial condition, which is precisely what Moore is alleged to have done. Section 532a provides in relevant part:

> "Any person who shall knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself or herself, or any other person, firm or corporation, in whom he or she is interested, or for whom

83

he or she is acting, for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the execution of a contract of guaranty or suretyship, the discount of an account receivable, or the making, acceptance, discount, sale or endorsement of a bill of exchange, or promissory note, for the benefit of either himself or herself or of that person, firm or corporation shall be guilty of a public offense." (*Id.*, subd. (1).)

The Legislature did not include the making of false financial statements of the type described in section 532a in the forgery statute. " 'Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent.' " (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1188.) The defendant is entitled to the benefit of every reasonable doubt, whether it arises out of a question of fact, interpretation of words, or construction of statutory language. (*People v. Davis* (1981) 29 Cal.3d 814, 828; *In re Rosalio S.* (1995) 35 Cal.App.4th 775, 781.)

The cases cited by the People do not assist them. In *Gaul-Alexander*, a county parole agent forged a removal order from prison to the county jail in an attempt to facilitate his escape. (*Gaul-Alexander*, *supra*, 32 Cal.App.4th at p. 739.) This was a violation of subdivision (c) of section 470, respecting court documents, which is not applicable here. In *People v. Russel* (1963) 214 Cal.App.2d 445, the defendant forged another person's signature to obtain college transcripts. There is no evidence to show that Moore forged another person's signature on the brokerage statement. *People v. Thorn* (1934) 138 Cal.App. 714 concerns a complex scheme in the early 1930's in which the defendant made false entries in the accounts receivable ledger of his company, increased

84

the cost of machinery by falsifying receipts, and made other false entries and deposits in order to increase his company's credit balance and personally profit from the difference between the real and fictitious cost of the machinery. (*Id*. at pp. 728-730.) While this scheme is similar to many of Moore's embezzlement practices, it bears no resemblance to the charge of forgery for which she was convicted.

We conclude that falsification of a brokerage account statement does not constitute forgery within the meaning of section 470. Accordingly, we reverse Moore's conviction for forgery.

G.      *The Aggravated White Collar Crime Enhancement*

Moore claims that the Berkley/Anderson, the military benefits, and the Markovich counts involved different methods of commission and were not interrelated, and therefore did not constitute a pattern of related felony conduct within the meaning of section 186.11, subdivision (a)(2). She argues the aggregation of disparate counts resulted in the imposition of an unduly harsh sentence.

"The purpose of the aggravated white collar crime enhancement [is] to provide a mechanism for greater punishment for criminals who engage in a pattern of fraudulent activity that results in a large amount of accumulated takings." (*People v. Williams* (2004) 118 Cal.App.4th 735, 747.) Section 186.11 provides: "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two

85

or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3)."  (§ 186.11, subd. (a)(1).)

" '[P]attern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events.  For purposes of this section, 'two or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions."  (§ 186.11, subd. (a)(1).)  "If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."  (§ 186.11, subd. (a)(2).)

Moore's contention she did not engage in a pattern of related felony conduct is without merit.  The record shows that Moore engaged in crimes of theft against Berkley, Anderson, Dr. Markovich and the Department of Defense.  All of the victims were deceived by "a pattern of fraudulent activity that result[ed] in a large amount of accumulated takings."  (*People v. Williams*, *supra*, 118 Cal.App.4th at p. 747.)  Moore defrauded each victim on two or more separate occasions, and used part of the funds obtained from each victim to cover up her thefts from her individual victims.  Moore's pattern of thefts was interrelated, and did not occur as isolated events.  (§ 186.11, subd. (a)(1).)

DISPOSITION

We reverse the convictions on count 1 (Berkley grand theft), count 3 (Anderson grand theft, count 8 (Markovich grand theft) and count 10 (forgery).  In all other respects, the judgment is affirmed.  Because section 654 no longer bars the imposition of sentence on count 2 (Berkley embezzlement) and count 4 (Anderson embezzlement), the matter is remanded for resentencing and modification of the abstract of judgment.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.